**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 11** |
| MC PRECAST, INC.,| ) | |
| | ) | **CASE NO.  10-10466-WHD** |
| Debtor. | ) | |

**DEBTOR'S MOTION FOR AN INTERIM ORDER (1) AUTHORIZING
DEBTOR-IN-POSSESSION TO OBTAIN FINANCING, GRANT SECURITY
INTERESTS AND ACCORD PRIORITY STATUS PURSUANT TO  11 U.S.C. §§  361,
364(c) AND 364(d); (2) AUTHORIZING DEBTOR TO USE CASH COLLATERAL
PURSUANT TO 11 U.S.C. §§ 361 AND 363; (3) GIVING NOTICE OF FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(b)(2) AND (c)(2); AND (4) MODIFYING
AUTOMATIC STAY**

NOW COMES MC Precast, Inc. (the "**Debtor**"), debtor and debtor-in-possession in the
above-styled Chapter 11 case, by and through its undersigned counsel, and makes and files this
Motion For An Interim Order (1) Authorizing Debtor-In-Possession To Obtain Financing, Grant
Security Interests And Accord Priority Status Pursuant To 11 U.S.C. §§  361, 364(c) And 364(d);
(2) Authorizing Debtor To Use Cash Collateral Pursuant To 11 U.S.C. §§ 361 And 363; (3)
Giving Notice Of Final Hearing Pursuant To Bankruptcy Rule 4001(b)(2) And (c)(2); And (4)
Modifying Automatic Stay (the "**DIP Motion**") and hereby moves this Court, pursuant to
Sections 105, 361, 362, 363 and 364 of Title 11 of the United States Code, 11 U.S.C. § 101 *et
seq.* as amended (the "**Bankruptcy Code**"), and Rules 2002, 4001(b)(2) and 4001(c)(2) and
9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an
order in a form substantially similar to Exhibit A attached hereto (the "**Interim Order**"), *inter
ali,* (1) authorizing the Debtor to obtain post-petition financing under the terms set forth in the
Post-Petition Loan and Security Agreement (the "**DIP Credit Agreement**") attached hereto as
Exhibit B; (2) authorizing the Debtor to use cash collateral within the meaning of Bankruptcy

Code § 363(a); (3) authorizing the Debtor to grant ACB a super-priority claim over any and all

administrative expenses other than as set forth in any order granting the DIP Motion; (4)

scheduling a final hearing ("**Final Hearing**") for approval of the proposed post-petition

financing and entry of a final order granting the DIP Motion (the "**Final Order**"); and (5)

granting related relief, including, without limitation, modification of the automatic stay pursuant

to Section 362 of the Bankruptcy Code.  Any capitalized terms not defined herein shall have the

meanings ascribed to such term in the DIP Credit Agreement.

I.      **BANKRUPTCY RULE 4001(c)(1)(B) STATEMENT OF RELIEF REQUESTED**

A.  **Summary of Material Terms of DIP Credit Agreement**

The following summarizes the material terms and conditions of the proposed DIP Credit

Agreement in accordance with Bankruptcy Rule 4001(c)(1)(B).  In the event of any conflict or

inconsistency between the language of this summary and the DIP Credit Agreement, the

provisions of the DIP Credit Agreement shall govern.

1.  **General Overview**

As of the Petition Date, the Debtor was indebted to ACB and One Georgia Bank
("**OGB**") in the approximate amount of $4,305,778, exclusive of contract interest, default
interest, default charges, and fees, costs and expenses, under one or more revolving lines of
credit and/or term loans (the "**Pre-Petition Loan Documents**").  ACB asserts that all amounts
owed by the Debtor to ACB as of the Petition Date are secured by, inter alia, (i) that certain
Security Agreement dated January 4, 2008, between Debtor and ACB, (ii) that certain Security
Agreement dated as of March 5, 2008, between Debtor and ACB, (iii) that certain Security
Agreement dated April 30, 2008, between Debtor and ACB, (iv) that certain Security Agreement
dated as of September 19, 2008, between Debtor and ACB, (v) that certain Commercial Security
Agreement dated February 25, 2009, by Debtor in favor of ACB, (vi) that certain Security
Agreement dated as of March 20, 2009, between Debtor and ACB, in its capacity as agent for
itself and One Georgia Bank, (vii) that certain Deed to Secure Debt, Assignment of Rents and
Security Agreement dated March 20, 2009, made by Debtor in favor of ACB, in its capacity as
agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 108-134, Records
of Coweta County, Georgia, (viii) that certain Deed to Secure Debt, Assignment of Rents and
Security Agreement dated March 20, 2009, made by Debtor in favor of ACB, in its capacity as
agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 152-178, Records
of Coweta County, Georgia, and (ix) that certain Security Agreement dated as of May 27, 2009,
among Debtor, Mahlon C. Rhaney, Jr., Kathleen J. Rhaney, in favor of ACB.

ACB further contends that the Debtor granted security interests in and liens upon all or substantially all of Debtor's real and personal property, which property ACB asserts includes, without limitation, Debtor's facility located in Newnan, Georgia, and all accounts, inventory, equipment, fixtures, general intangibles, chattel paper, contracts, deposit accounts, documents, intellectual property, customer lists, instruments, investment property, letter-of-credit rights, supporting obligations and, to the extent not otherwise included, all proceeds of each of the foregoing and all accessions, to, substitutions and replacements for and rents, profits and products of each of the foregoing (all such real and personal property owned by Debtor, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "**Pre-Petition Collateral**").

In addition to liens and security interests in favor of ACB and statutory liens for taxes, Debtor has granted liens and security interests in favor of Georgia Bank; The United States Small Business Administration ("**SBA**"); Consult-US, LLC ("**Consult**"); and Jeffrey S. Muir ("**Muir**"). Pursuant to a Third Party Lender Agreement dated March 20, 2009, between ACB, Georgia Resource Capital, Inc., and the SBA; a Subordination Agreement dated September 19, 2008, between Consult, ACB and Debtor; and a Subordination Agreement dated September 19, 2008, between Muir, ACB and Debtor; each of the SBA, Consult and Muir has agreed to subordinate such creditor's liens and security interests in favor of liens and security interests granted by Debtor in favor of ACB.

2. **Material Terms**

a.      **Summary of Rates, Fees and Charges for DIP Facility:**  The proposed DIP Credit Agreement provides for interest to accrue on all unpaid principal amounts of the loans (the "**DIP Loans**") from the respective dates such principal amounts are advanced until paid at a fixed rate equal to eight percent (8%) per annum.  <u>See</u> DIP Credit Agreement Section 2.1.1.  From and after the occurrence of any Event of Default, the principal amount of the Obligations will bear interest at a fixed rate equal to twelve percent (12%) per annum.  <u>See</u> DIP Credit Agreement Section 2.1.2.

b.      **Repayment**:  The principal amount of the DIP Loans shall be paid by Debtor to ACB immediately upon (a) each receipt by ACB or Debtor of any proceeds of any of the Collateral, to the extent of such proceeds, unless and to the extent such proceeds are authorized to be used by Debtor pursuant to the Interim Order and/or Final Order, and (b) the Termination Date.  <u>See</u> DIP Credit Agreement Section 4.2.1.  Interest accrued on each DIP Loan shall be due and payable on the first calendar day of each month (for the immediately preceding month), computed through the last calendar day of the preceding month.  All accrued interest shall also be paid by Debtor on the Termination Date.  <u>See</u> DIP Credit Agreement Section 4.2.2; and Paragraph 5 of the Interim Order.

c.      **Events of Default**:  Events of Default include any breach by Debtor of the Interim Order or the Final Order and any Event of Default set forth in Section 11.1 of the DIP Credit Agreement.  <u>See</u> DIP Credit Agreement Section 11.1; and Paragraph 13 of the Interim Order.

d.      **Liens**:  Pursuant to the DIP Credit Agreement, the Debtor grants ACB a continuing security interest in and lien upon all of Debtor's property and interests in property, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or is created or acquired after the Petition Date) and wherever located.  In addition, the Obligations shall also be secured by the Cash Collateral to the extent provided herein and all of the other items of property from time to time described in any of the security documents as security for any of the Obligations.  The due and punctual payment and performance of the Obligations shall also be secured by a lien upon the Newnan Plant and any other Real Estate. See DIP Credit Agreement Section 6.3; and Paragraph 3 of the Interim Order.

e.      **Borrowing Limits**:  ACB has agreed to provide a discretionary secured lending facility in favor of Debtor pursuant to which Debtor may obtain loans from time to time, in the sole and absolute discretion of ACB, but not to exceed $500,000 in principal balance outstanding, upon the terms and conditions set forth in a certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits and annexes thereto, and as at any time amended or restated) between ACB and Debtor.  See DIP Credit Agreement Section 1; and Paragraph 1 of the Interim Order.

f.      **Borrowing Conditions**:  Entry of Interim Order and Final Order acceptable to ACB, and compliance with orders and DIP Credit Agreement by Debtor.  See DIP Credit Agreement Sections 10.1 and 10.2.

### 3. Summary and Identification of Additional Required Provisions

a.      **Liens under § 364(c) or (d)**:  As security for the post-petition indebtedness, ACB is granted the following security and liens in the Collateral, subject only to the payment of a "carve out" for professional fees as set forth in Paragraph 8 of the Interim Order:

(1)      Pursuant to Section 364(c) (2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon all Collateral that, as of the Petition Date, is not subject to other valid, perfected and non-avoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code;

(2)      Pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and non-avoidable liens in existence on the Petition Date (other than liens in favor of ACB or any Subordinated Creditor) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date) as permitted by Section 546(b) of the Bankruptcy Code;

(3)      Pursuant to Section 364(d)(1) of the Bankruptcy Code, DIP Liens shall prime and shall be senior in priority to all pre-petition liens and security interests with respect to any of the Collateral that exists in favor of ACB or any Subordinated Creditor; and

(4)      The DIP Liens shall be subject to the Carve-Out, and the DIP Liens shall not attach to any of the following property: (i) any claims pursuant to Sections 544, 545, 547, 548, 549, or 550

of the Bankruptcy Code ("**Avoidance Claims**"), or (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims ("**Avoidance Proceeds**").
<u>See</u> DIP Credit Agreement Section 6; and Paragraph 3 of the Interim Order.

b.      **Adequate Protection for Pre-Petition Claims**:    As adequate protection of ACB's interest in the Collateral, including use of the Cash Collateral, pursuant to 11 U.S.C. §§ 361, 363 and 552(b), ACB is granted replacement liens in and to all of the Collateral that is created, acquired or first arises after the Petition Date (the "**Replacement Liens**") as partial adequate protection to the extent of the diminution in value of the Collateral caused by the Debtor's use, consumption, sale, collection or other disposition of any Collateral. The Replacement Liens in favor of ACB on the Collateral shall be junior in priority to the DIP Liens granted to the ACB and shall be held by ACB for the benefit of itself and, as to diminution in the value of certain Pre-Petition Collateral as to which ACB holds pre-petition liens and security interests as agent, for the ratable benefit of OGB.  <u>See</u> Paragraph 7 of the Interim Order.

c.      **Validity of Pre-Petition Claims and Liens**:  In Paragraphs C and D of the Interim Order, ACB asserts the amount and validity of  the Debtor's indebtedness in favor of ACB, as well as the validity and first priority status of liens in substantially all assets of the Debtor securing said indebtedness.  Debtor acknowledges that it is not aware of any basis to contest that the security interests and liens granted by the Debtor to ACB pursuant to the DIP Credit Agreement are legal, valid, enforceable, duly perfected security interests in and liens upon the Pre-Petition Collateral.  Pursuant to Paragraph 17 of the Interim Order, the Debtor waives all rights to challenge the amounts and securitization of all pre-petition debt of ACB or to assert any lender liability theories against ACB, subject to entry of a Final Order.   In addition, any challenge to the validity, extent, enforceability and perfection of these liens and security interests of ACB in the Collateral may only be challenged at the earlier of the hearing on approval of a sale of the Debtor's assets or 60 days after entry of the Interim Order.  <u>See</u> Interim Order Paragraph 17.

d.      **Waiver of Automatic Stay**:   Except as otherwise provided in the Interim Order, the automatic stay provisions of Section 362 of the Bankruptcy Code are lifted and terminated as to ACB to the extent necessary to implement the provisions of the Interim Order and the DIP Financing Documents, thereby permitting ACB, *inter alia*, to receive collections of Collateral for application to the Pre-Petition Debt and the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon default subject to the prior notice provisions of the Interim Order.  <u>See</u> Interim Order Paragraph 15.

e.      **Waiver of State Law Perfection Requirements**:  The DIP Liens are deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of the Interim Order.  <u>See</u> DIP Credit Agreement Section 6.4; and Paragraph 10 of the Interim Order.

f.      **Waiver of Surcharge Right**:  The Debtor waives its right to seek a surcharge against the Pre-Petition Collateral or the Collateral under § 506(c).  <u>See</u> Interim Order Paragraph 4.

g.    **Provisions Remaining Effective if Interim Relief Granted but Final Relief Denied**:
The provisions of the Interim Order are binding upon and inure to the benefit of ACB, and the
Debtor, and their respective successors and assigns (including any trustee or other estate
representative appointed as a representative of the Debtor's estate).   If any of the provisions of
the Interim Order are modified, vacated or stayed by subsequent order, such stay, modification or
vacatur shall not affect the validity of any obligation outstanding immediately prior to the
effective time of such stay, modification or vacation, or the validity and enforceability of any
lien, priority, right, privilege or benefit authorized by the Interim Order with respect to any such
obligations.  Notwithstanding any such stay, modification or vacatur, any obligation outstanding
immediately prior to the effective time of such modification, stay or vacatur shall be governed in
all respects by the original provisions of the Interim Order, and ACB shall be entitled to all the
rights, privileges and benefits, including, without limitation, the security interests and priorities
granted by the Interim Order, with respect to all such obligations. See Interim Order Paragraphs
16 and 20.

## II.    STATEMENT OF FACTS AND BACKGROUND

### A.    Bankruptcy Filing

On February 8, 2010, (the "**Petition Date**"), the Debtor filed a voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The

Debtor continues in possession of its property and management of its business as a debtor-in-

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No official committee

of unsecured creditors or other statutory committee and no trustee or examiner has been

appointed in this case.

### B.    The Debtors' Business Structure and Background

The Debtor is a manufacturing and construction company specializing in concrete

building systems.  Since its inception in 1991, the Debtor has provided its products and services

throughout the Southeast and as far as California, Michigan and Pennsylvania.   Debtor

manufactures precast concrete retaining walls, sound walls, architectural wall panels, temporary

median and security barriers, traffic barriers and other specialty concrete products from its

manufacturing facility located in Newnan, Georgia.   In 2007, the Debtor entered into an

exclusive license agreement with Spancrete ® Machinery Corporation to market and manufacture Spancrete ® pre-stressed concrete hollow core floor slabs and wall panels. Additionally, the Debtor provides construction services to both the public and private sector.

C.       **Requested Relief**

The Debtor requests entry of the Interim Order and ultimately entry of a Final Order granting the DIP Motion and authorizing the Debtor to enter into the DIP Credit Agreement with ACB. The Debtor has an immediate need to obtain post-petition financing and to use cash collateral to pay its normal and ordinary operating expenses (such as payroll, rent, utilities and payments to suppliers) as they come due in the ordinary course of the Debtor's business and to make those purchases necessary to preserve the going concern value of its business and assets pending any sale or reorganization efforts. A proposed interim budget is attached hereto as Exhibit C. Absent entry of the Interim Order, the Debtor would suffer immediate and irreparable harm.

The Debtors submit that the protections requested by ACB are reasonable in light of the substantial risk that ACB is taking by agreeing to lend the Debtor significant additional sums in addition to the approximately $4,305,778 already owed to ACB and OGB. Indeed, since ACB is already secured by a first priority lien against substantially all of the Debtor's assets, ACB and OGB are the only creditors who would receive any recovery in the event of a liquidation of the Debtor, and the only realistic source of post-petition financing and liquidity.

The Debtor has also been unable to procure financing in the form of unsecured credit allowable under section 503(b) (1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364 (c)(1) of the Bankruptcy Code without the granting of liens on its assets. The Debtor has been unable to procure the necessary financing on terms more

- 7 -

favorable than those contained in the Interim Order.  No other lender was prepared to provide the financing needed by the Debtor on these or more favorable terms.

The Debtor therefore seeks authority to obtain the post-petition financing and to use cash collateral on an interim emergency basis pending a Final Hearing in accordance with the terms and conditions set forth in the Interim Order.  Given the devastating impact that a closure of the Debtor's business would have on its going concern value, its creditors and employees, the Debtor submits that the relief requested herein is clearly warranted and appropriate.

## III.    DISCUSSION

### A.    The Debtor Should Be Authorized To Obtain Debtor In Possession Financing To Operate, Maintain and Preserve its Business.

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtor requests authority to incur post-petition financing allowable as an administrative expense, having priority over other administrative expenses and secured by a senior lien on substantially all of the property of the Debtor's estate.  The Debtor needs cash to meet ongoing obligations necessary to operate its business, administer its Chapter 11 estate and maintain the going concern value of its business as it pursues an asset sale or reorganization so as to achieve the highest values possible for its creditors.  The Debtor needs to use its cash receipts and the proceeds of the post-petition financing to pay insurance, payroll, payroll expenses, rent, utility charges, professionals and general overhead, to purchase necessary materials, and otherwise continue its business and operations.  The Debtor believes that the post-petition financing will provide funds sufficient to permit it to operate its business for a short period while the Debtor pursues a sale of the business and reorganization efforts.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if it has been unable to obtain unsecured credit and the borrowing

is in the best interest of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (Bankr. D. Colo. l985) (authorizing interim financing where debtor's business judgment was that financing was necessary and of benefit to the estate); In re Ames Department Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); See also 2 Collier on Bankruptcy ¶ 364.04, at 364-9-1 ( 2007).

Section 364(d) (l) of the Bankruptcy Code governs the incurring of senior secured debt or "priming" loans.  Pursuant to Section 364(d) (1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if

> (1)     the trustee is unable to obtain such credit otherwise; and
>
> (2)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d) (1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.  See In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988). If a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully permitted conditions.  In re T.M. Sweeney  & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr. N.D. Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C § 364(d).  See In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also contains incentives that a court may grant to post-petition lenders.  These inducements are not exhaustive.  Courts frequently have authorized the use of other protections not specified in the statute.  See, e.g., In re Ellinssen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) aff'd 145 B.R. 312, 316 (BAP 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness). The Debtor has agreed to grant ACB such enhancements in the form of senior liens against its pre-petition and post-petition assets.

Two factors courts consider in determining whether to authorize post-petition financing which grants a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit as an administrative claim under Section 364(b)(1)(A) and whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor and lender.  See In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); See also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

The Debtor submits that all, of these standards have clearly been satisfied in this case.

1.      **The Debtor Was Unable to Obtain Unsecured Credit.**

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under §§ 364(a) and (b).  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by contacting

- 10 -

other financial institutions in immediate geographic area; the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable); In re Ames Department Stores, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As mentioned above and as will be demonstrated at the Hearing, the Debtor has been unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c) (1) of the Bankruptcy Code without the grant of liens on assets. The Debtor has been unable to procure the necessary financing on terms more favorable than those contained in the Interim Order. No other lender was prepared to provide the financing needed by the Debtor.

   2.      **The Terms Of The Proposed Post-Petition Financing Are Fair, Reasonable and Adequate.**

The terms of the proposed post-petition financing from ACB are fair, reasonable and adequate. ACB is taking a substantial economic risk by lending the Debtor significant additional sums in addition to the approximately $4,305,778 already owed to ACB and OGB. Notwithstanding the substantial economic risk that ACB is taking, ACB has agreed to provide such post-petition financing in order to unable the Debtor to preserve the going concern value of its business.

The terms of the Interim Order were negotiated by and between the Debtor, ACB, and their respective counsel. Although the Debtor was offered alternative post-petition financing, the proposed terms were not as favorable as those the Debtor negotiated with ACB.

3.      **The Liens Being "Subordinated" Are Already Junior To The Liens Which Currently Exist In Favor Of ACB.**

Although the liens granted to ACB to secure repayment of the post-petition financing and as adequate protection for the use of the Pre-Petition Collateral technically prime the junior liens in favor of the SBA, Consult, and Muir (the "**Subordinated Lenders**"), ACB along with OGB are currently secured by a first priority lien against all of the Debtor's assets and has the ability under its current loan documents to lend more money to the Debtor secured by a senior lien against all of its assets.  OGB has indicated that it does not object to ACB obtaining a priming lien as a result of the extension of this new financing facility.    Thus, the liens being "subordinated" are already junior to the liens which currently exist in favor of ACB.

Further, the Subordinated Lenders have no right to object to the Debtor granting the security interests and liens to the ACB on the terms set forth in the Interim Order, pursuant to the terms of a Third Party Lender Agreement dated March 20, 2009, between ACB, Georgia Resource Capital, Inc., and the SBA; a Subordination Agreement dated September 19, 2008, between Consult, ACB and Debtor; and a Subordination Agreement dated September 19, 2008, between Muir, ACB and Debtor.  The various subordination agreements constitute enforceable agreements in this case pursuant to Bankruptcy Code § 510(a).    Under the subordination agreements, the Subordination Lenders agreed that they would at all times and in all respects be subordinate and junior in right of payment to any and all indebtedness to ACB and their security interest in the Debtor's collateral would be subordinate to any existing and future security interests by ACB.

4.      **The Debtor, In The Exercise Of Its Business Judgment, Believes That The Financing From ACB Is Necessary And Proper**.

In determining whether to approve a financing transaction, Court should use its informed discretion, but give deference to the business decision of a Chapter 11 debtor.  See Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  After investigating its options, the Debtor determined that the financing offered by ACB was the best alternative available.  Without new financing, the Debtor's only option for survival would be to seek Court approval for use of cash collateral alone (most likely over ACB's objection); however, it is unlikely that the use of cash collateral alone would allow the Debtor to sustain its operation for any length of time.

5.      **The Debtor Has Satisfied The Procedural Requirements Regarding Authority To Obtain Credit.**

Bankruptcy Rule 4001(c) sets forth the procedural requirements for obtaining credit. Bankruptcy Rule 4001(c)(1) requires in relevant part that: "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on . . . the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct. The motion shall be accompanied by the copy of the agreement.  Concurrently with the filing of this Motion with the Court, the Debtor will serve a copy of the Motion upon the Office of the United States Trustee, its pre-petition senior secured creditors, and the parties on the List of Twenty Largest Unsecured Creditors by electronic mail and/or facsimile.  The Motion is accompanied by a copy of the proposed Interim Order setting forth the terms of the proposed post-petition financing.  Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(c)(1) and the Debtor requests that the Court authorize it to enter into the DIP Credit Agreement.

- 13 -

B.  **The Debtor Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve its Business.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c) (1) provides in pertinent part:

"If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral to maintain and operate its property.  See 11 U.S.C. § 363(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (9th Cir. BAP 1991).  The purpose of Chapter 11 is to rehabilitate debtors and access to cash collateral is essential to operate a business.  In re Dynaco Corporation, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).  For the Debtor's businesses to remain viable and to preserve going concern value, continued use of cash collateral is needed. Moreover, ACB will consent to the use of cash collateral pursuant to the terms of the Interim Order.

IV.  **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court:

1.      enter the proposed Interim Order;

2.      grant interim approval of the post-petition financing pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion and the DIP Credit Agreement;

- 14 -

3.      authorize the Debtor to use its cash collateral to pay its expenses on an emergency interim basis pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion;

4.      set a final hearing to consider approval of the DIP Motion; and

5.      grant such other and further relief as the Court deems just and proper.

This 11th day of February, 2010.

SCROGGINS & WILLIAMSON

 /s/ Ashley R. Ray
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
JOHN T. SANDERS, IV
Georgia Bar No. 625705
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
1500 Candler Building
127 Peachtree Street, NE
Atlanta, Georgia 30303
Telephone: (404) 893-3880
Telecopier: (404) 893-3886
E-mail:  rwilliamson@swlawfirm.com
        jsanders@swlawfirm.com
        aray@swlawfirm.com
Counsel for the Debtor

- 15 -

*PHR&D Draft Copy*
*For Discussion Purposes Only*
*Subject to Change*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| **MC PRECAST, INC.,** | ) | CASE NO. 10-10466-WHD |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**INTERIM ORDER (1) AUTHORIZING DEBTOR-IN-POSSESSION TO OBTAIN
FINANCING, GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS
PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (2) AUTHORIZING DEBTOR
TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363;
(3) GIVING NOTICE OF FINAL HEARING PURSUANT TO
BANKRUPTCY RULE 4001(b)(2) AND (c)(2);
AND (4) MODIFYING AUTOMATIC STAY**

This matter is before the Court on the Emergency Motion (the "*Motion*") of the Debtor **MC
PRECAST, INC.**, a Georgia corporation, as debtor and debtor-in-possession in the above-captioned
Chapter 11 case (the *"Debtor"*), requesting entry of an order (1) authorizing Debtor to obtain
financing and other extensions of credit from **ATLANTIC CAPITAL BANK** ("*ACB*" or, in its
capacity as post-petition lender, "*DIP Lender*"), grant security interests and liens and accord
superpriority claim status in favor of DIP Lender pursuant to Sections 361**,** 364(c) and 364(d) of
Title 11 of the United States Code (the "*Bankruptcy Code*"); (2) authorizing Debtor to use cash
collateral pursuant to Section 363 of the Bankruptcy Code; (3) giving notice of a final hearing
pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (4) modifying the automatic stay.

1437324v1

Based upon this Court's review of the Motion and all matters brought to the Court's attention at the interim hearing, which was held on February 12, 2010, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "*Interim Hearing*"), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable to the financing sought by Debtor from DIP Lender and Debtor's request to use cash collateral (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A.     On February 8, 2010 (the "*Petition Date*"), Debtor filed with this Court its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") and is continuing to manage its properties and to operate its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed herein.

B.     Debtor acknowledged in the Motion or at the Interim Hearing that, as of the Petition Date, Debtor was indebted to ACB and One Georgia Bank (collectively, the "*Pre-Petition Lenders*") in at least the approximate principal amounts (excluding interest, fees and other charges) shown below:

| | |
|---|---|
| ACB Line of Credit: | $1,809,564 |
| ACB Real Estate Term Loan: | $4,270,155 |
| One Georgia Bank Real Estate Term Loan: | $1,769,944 |
| One Georgia Bank Line of Credit: | $1,722,964 |
| ACB Term Loan: | $678,358 |
| ACB Interim Note: | $174,993 |
| ACB Contingent Reimbursement Obligations (Standby Letter of Credit): | $323,000 |

-2-

The obligations owed by Debtor to Pre-Petition Lenders arise out of loans made by Pre-Petition Lenders and promissory notes, security deeds, security agreements and related agreements executed and delivered by Debtor in favor of Pre-Petition Lenders.

C.      ACB asserts that all amounts owed by Debtor to ACB as of the Petition Date (such principal amounts, together with all interest, fees, attorneys' fees, expenses and other amounts heretofore or hereafter accruing thereon or at any time chargeable to Debtor in connection therewith, is referred to as the "*Pre-Petition Debt*") are secured by (i) that certain Security Agreement dated January 4, 2008, between Borrower and ACB, (ii) that certain Security Agreement dated as of March 5, 2008, between Borrower and ACB, (iii) that certain Security Agreement dated April 30, 2008, between Borrower and ACB, (iv) that certain Security Agreement dated as of September 19, 2008, between Borrower and ACB, (v) that certain Commercial Security Agreement dated February 25, 2009, by Borrower in favor of ACB, (vi) that certain Security Agreement dated as of March 20, 2009, between Borrower and ACB, in its capacity as agent for itself and One Georgia Bank, (vii) that certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of ACB, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 108-134, Records of Coweta County, Georgia, (viii) that certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of ACB, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 152-178, Records of Coweta County, Georgia, and (ix) that certain Security Agreement dated as of May 27, 2009, among Borrower, Mahlon C. Rhaney, Jr., and Kathleen J. Rhaney, in favor of ACB (collectively, the "*Pre-Petition Security Agreements*").

D.      As security for the payment of all Pre-Petition Debt, Debtor acknowledges that it

granted to ACB, for its own benefit and (as to certain Pre-Petition Collateral (defined below)) as agent for the benefit of itself and One Georgia Bank ("*OGB*"),[1] pursuant to the Pre-Petition Security Agreements and related documents (collectively, the "*Pre-Petition Loan Documents*"), security interests in and liens upon all or substantially all of Debtor's real and personal property, which property ACB asserts includes, without limitation, Debtor's facility located in Newnan, Georgia, and all accounts, inventory, equipment, fixtures, general intangibles, chattel paper, contracts, deposit accounts, documents, intellectual property, customer lists, instruments, investment property, letter-of-credit rights, supporting obligations and, to the extent not otherwise included, all proceeds of each of the foregoing and all accessions, to, substitutions and replacements for and rents, profits and products of each of the foregoing (all such real and personal property owned by Debtor, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "*Pre-Petition Collateral*").  ACB asserts, and Debtor is not aware of any basis to contest, that the security interests and liens granted by Debtor to ACB pursuant to the Pre-Petition Loan Documents are legal, valid, enforceable, duly perfected security interests in and liens upon the Pre-Petition Collateral.

    E.    An immediate and ongoing need exists for Debtor to obtain financing and use the cash proceeds of the Collateral (as defined below) (the "*Cash Collateral*") to continue the operation of its business as debtor-in-possession under Chapter 11 of the Bankruptcy Code, to minimize the disruption of Debtor's business and to allow Debtor to pursue an orderly sale of its assets.

---

1    References in this Order to "ACB" in connection with pre-petition liens and security interests held by ACB, remittance of proceeds of Pre-Petition Collateral to ACB, and Replacement Liens in favor of ACB shall mean and be construed (1) to refer to ACB alone with respect to Pre-Petition Collateral in which ACB holds a lien or security interests for its sole benefit, and (2) to refer to Atlantic Capital Bank, as agent for the benefit of itself and OGB, with respect to Pre-Petition Collateral in which ACB holds pre-petition liens and security interests in its capacity as agent for the benefit of itself and OGB.

Despite diligent efforts, Debtor has been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and other than the discretionary financing from DIP Lender pursuant to the DIP Credit Agreement (as hereinafter defined), Debtor is unable to obtain financing in the form of credit secured by liens that are junior to existing liens on property of the estate pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

F.    Debtor has requested that DIP Lender establish a discretionary secured lending facility in favor of Debtor (the "*DIP Facility*") pursuant to which Debtor may obtain loans from time to time  ("*DIP Loans*"), in the sole and absolute discretion of DIP Lender, but not to exceed $500,000 in principal balance outstanding, upon the terms and conditions set forth herein and in a certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits and annexes thereto, and as at any time amended or restated, the "*DIP Credit Agreement*") between DIP Lender and Debtor, in substantially the form attached to the Motion.

G.    DIP Lender is willing to establish the discretionary DIP Facility, upon the terms and conditions set forth herein and in the DIP Credit Agreement.  DIP Lender's willingness to make DIP Loans and other extensions of credit (collectively, the "*DIP Credit Extensions*") is conditioned upon, among other things, Debtor's obtaining Court authority to provide adequate protection of ACB's interests in the Pre-Petition Collateral pursuant to Sections 361 and 363 of the Bankruptcy Code.

H.    A condition to the willingness of DIP Lender to establish the DIP Facility is that, as security for the prompt payment of all DIP Loans, together with all interest, fees, expenses and the charges at any time payable by Debtor under the DIP Credit Agreement, DIP Lender receive a

security interest in and lien upon all of Debtor's pre-petition and post-petition assets (both real and personal), including, without limitation, Debtor's real property, improvements and fixtures located in Coweta County, Georgia, and all of Debtor's accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, contract rights, investment property, leasehold interests, supporting obligations, cash, and books and records relating to any assets of Debtor and all cash and non-cash proceeds (including insurance proceeds) of the foregoing, whether now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, and the proceeds thereof, being collectively hereinafter referred to as the "*Collateral*"), and that such liens have the priority hereinafter set forth. The Collateral shall not include Avoidance Claims or Avoidance Proceeds and shall be subject to the Carve-Out, all as defined and set forth below.

I.      Debtor has represented and disclosed that, in addition to liens and security interests in favor of ACB and statutory liens for taxes, Debtor has granted liens and security interests in favor of One Georgia Bank ("*OGB*"); The United States Small Business Administration ("*SBA*"); Consult-US, LLC ("*Consult*"); and Jeffrey S. Muir ("*Muir*"). Pursuant to a Third Party Lender Agreement dated March 20, 2009, between ACB, Georgia Resource Capital, Inc., and the SBA; a Subordination Agreement dated September 19, 2008, between Consult, ACB and Debtor; and a Subordination Agreement dated September 19, 2008, between Muir, ACB and Debtor; each of the SBA, Consult and Muir has agreed to subordinate such creditor's liens and security interests in favor of liens and security interests granted by Debtor in favor of ACB. At the Interim Hearing, counsel for OGB did not oppose the priming liens being granted in favor of DIP Lender pursuant to Section 364(d) of the

-6-

Bankruptcy Code. OGB, the SBA, Consult and Muir are hereinafter referred to as the "*Subordinated Creditors*."

J.        Debtor requested in the Motion, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), that the Court hold the Interim Hearing to consider authorizing Debtor to (i) obtain, on an interim basis, DIP Loans for purposes specified in Debtor's cash flow forecast annexed to the Motion (as at any time amended with the consent of DIP Lender, the "*Budget*"); and (ii) to use Cash Collateral as hereinafter set forth.

K.        Debtor has certified that a copy of the Motion (together with copies of the proposed DIP Credit Agreement and Budget annexed thereto) and notice of the Interim Hearing have been served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Trustee (the "*U.S. Trustee*"), counsel for ACB, each of the Subordinated Creditors, the 20 largest creditors of Debtor, the Internal Revenue Service, and any known lien creditors of Debtor. The Court finds that notice of the Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c).

L.        Good cause has been shown for the entry of this Order and authorization for Debtor to obtain DIP Credit Extensions pursuant to the DIP Credit Agreement and to use Cash Collateral as hereinafter provided pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "*Final Hearing*"). Debtor's need for financing of the type afforded by the DIP Credit Agreement is immediate and critical. Entry of this Order will minimize disruption of Debtor's business and operations, will preserve the assets of Debtor's estate and is in the best

-7-

interests of Debtor, its creditors and its estate.  The terms of the proposed financing and use of Cash Collateral appear fair and reasonable, reflect Debtor's exercise of business judgment and are supported by reasonably equivalent value and fair consideration.

M.    Based upon the record presented at the Interim Hearing, it appears that the DIP Credit Agreement and this Interim Order have been negotiated in good faith and at arm's length between Debtor, on the one hand, and ACB and DIP Lender, on the other.  Therefore, all DIP Credit Extensions to Debtor pursuant to the DIP Credit Agreement shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

N.    This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1.    Grant of Motion; Authorization of Interim Financing.  The Motion is hereby granted and Debtor is hereby authorized (i) to execute and deliver the DIP Credit Agreement in substantially the form annexed to the Motion and all instruments, security agreements, assignments, pledges, mortgages and other documents referred to therein or requested by DIP Lender to give effect to the terms thereof (the DIP Credit Agreement and such other instruments, security agreements, assignments and other documents, as at any time amended, being collectively called the "*DIP Financing Documents*"); (ii) to obtain DIP Loans and other DIP Credit Extensions in accordance with the DIP Credit Agreement from time to time up to an aggregate principal amount outstanding at any time not to exceed $500,000, and to incur any and all liabilities and obligations thereunder and

-8-

to pay all interest, fees, expenses and other obligations provided for under the DIP Financing Documents; and (iii) to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof; provided, however, that, pending the Final Hearing and subject to all of the terms and conditions in the DIP Credit Agreement, Debtor may obtain DIP Credit Extensions only to the extent necessary to avoid immediate and irreparable harm to Debtor, which, for purposes hereof, shall mean proceeds of DIP Loans used (a) to pay the fees and expenses due and amounts owing by Debtor at any time to DIP Lender under the DIP Financing Documents, (b) for purposes specified (and in amounts not to exceed those shown) in the Budget, (c) to make payments pursuant to "first day" orders reviewed and approved by the Court and the DIP Lender, and (d) to pay other expenses that are authorized to be paid, prior to the Final Hearing, under the DIP Credit Agreement. DIP Lender shall not have any obligation or responsibility to make any DIP Credit Extensions (consistent with the discretionary nature of the DIP Facility) or to monitor Debtor's use of the DIP Loans or Cash Collateral and may rely upon Debtor's representations that the amount of DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Credit Agreement and Bankruptcy Rule 4001(c)(2). Neither the use of Cash Collateral by the Debtor nor the DIP Loans authorized under this Order shall impair, release or alter any liability of any guarantor, pledgor, co-obligor or surety with respect to the Pre-Petition Debt.

2.      Execution and Delivery of DIP Financing Documents.  Upon execution and delivery thereof, the DIP Financing Documents shall constitute valid and binding obligations of Debtor, enforceable against Debtor in accordance with their terms.  In furtherance of the provisions of paragraph 1 of this Order, Debtor is authorized and directed to do and perform all acts, to make,

execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings), and to pay all filing and recording fees, in each case as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Financing Documents, to validate the perfection of the DIP Liens (as defined below) or as otherwise required or contemplated by the DIP Financing Documents.

3.    DIP Liens.  Subject to the provisions of subparagraph 8(b) below, all DIP Credit Extensions, together with all interest, fees and other charges (including, without limitation, reasonable legal fees) at any time or times payable by Debtor to DIP Lender in connection therewith or otherwise pursuant to the DIP Financing Documents (all such DIP Credit Extensions, interest fees and other charges, including any "Obligations" as such term is defined in the DIP Credit Agreement, are collectively called the "*DIP Obligations*") shall be, and hereby are, secured by security interests and liens in favor of  DIP Lender with respect to all of the Collateral (collectively, the "*DIP Liens*"), as follows:

(a)    pursuant to Section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon all Collateral that, as of the Petition Date, is not subject to other valid, perfected and non-avoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code; and

(b)    pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and

-10-

non-avoidable liens in existence on the Petition Date (other than liens in favor of ACB or any Subordinated Creditor) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date) as permitted by Section 546(b) of the Bankruptcy Code; and

(c)      pursuant to Section 364(d) and Section 510(a) of the Bankruptcy Code, the DIP Liens shall prime and shall be in senior in priority to all pre-petition liens and security interests with respect to any of the Collateral that exist in favor of ACB (whether for the benefit of itself or for the benefit of itself and OGB) or any Subordinated Creditor.

Notwithstanding the foregoing provisions of this paragraph 3 or anything to the contrary in the DIP Financing Documents, the DIP Liens shall be subject to the Carve-Out (defined below), as and to the extent provided below, and the DIP Liens shall not attach to any of the following property (unless Debtor shall grant or consent to any lien or security interest therein in favor of any other party, in which event all such property shall be subject to the DIP Liens referred to in subparagraph (a) of this paragraph 3): (x) any claims pursuant to Sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code ("*Avoidance Claims*"), or (y) any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims ("*Avoidance Proceeds*").

4.     <u>Superpriority Claim; Surcharge</u>.

(a)     Subject to the provisions of paragraph 8(b) below, all DIP Obligations shall have administrative priority in accordance with, and shall constitute an allowed superpriority claim (the "*Superpriority Claim*") pursuant to, Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in Debtor's case of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Superpriority Claim shall not attach to any Avoidance Claims, be payable from any Avoidance Proceeds or adversely affect the Carve-Out (as defined below).

(b)     Except for the Carve-Out, no costs or administrative expenses that have been or may be incurred in the Chapter 11 Case, in any proceedings related hereto or in any superseding Chapter 7 case and no priority claims are or will be prior to or on a parity with the Superpriority Claim of DIP Lender for the DIP Obligations.  Subject to entry of a final order on the Motion, in no event shall any costs or expenses of administration be imposed upon ACB, DIP Lender or any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of ACB and DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by either of them.

5.     <u>Repayment</u>.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Financing Documents and as provided herein, without offset or counterclaim.  In no event shall Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by DIP Lender to Debtor or any of its subsidiaries or affiliates against any of the DIP Obligations unless and to the extent expressly otherwise agreed to in writing by DIP Lender.

DIP Lender and any of its successors or assigns shall be entitled to credit bid all or any portion of the outstanding DIP Obligations for all or any part or portion of the Collateral.

      6.    <u>Use of Cash Collateral</u>.

      (a)    Debtor shall, promptly after its receipt thereof, remit to ACB (in its capacities as pre-petition secured party and DIP Lender) all Cash Collateral at any time in the possession of Debtor; <u>provided</u>, <u>however</u>, that for so long as (i) no Event of Default has occurred under (and as defined in) the DIP Credit Agreement, (ii) all of the conditions precedent to DIP Credit Extensions contained in the DIP Credit Agreement are satisfied, and (iii) the Termination Date has not occurred under (and as defined in) the DIP Credit Agreement, Debtor shall be authorized to retain, and to utilize in the ordinary course of its business and for the purposes and in the amounts provided in the Budget, Cash Collateral in the amounts shown in the Budget. Nothing herein shall be deemed to constitute a consent by DIP Lender or ACB to any sale or other disposition of any Collateral or an agreement of either of them to release its security interests in any of the Collateral. Unless and until all of the Pre-Petition Debt and DIP Obligations have been paid in full and the DIP Facility has terminated, Debtor shall not be authorized to use any Cash Collateral (i) for any purpose except as otherwise authorized by this Order or (ii) obtained as a result of, or at any time after, the closing of a sale authorized by the Court under Section 363 of the Bankruptcy Code.  Notwithstanding the foregoing, all Collateral (including Cash Collateral) shall be subject to the Carve-Out.

      (b)    Except as otherwise expressly provided in paragraph 6(a), all proceeds realized from any sale or other disposition of any Collateral shall be remitted directly to ACB for application to the Pre-Petition Debt and DIP Obligations.  Such proceeds shall be applied to the Pre-Petition Debt and DIP Obligations as DIP Lender and ACB may elect from time to time, subject to the terms and

conditions set forth herein.  Without limiting the generality of the foregoing, ACB is hereby authorized to negotiate and apply to the Pre-Petition Debt the funds represented by a check from Westfield Insurance dated January 26, 2010, in the amount of $20,616.21, which was endorsed by Debtor prior to the Petition Date.

7. <u>Adequate Protection of Pre-Petition Lenders</u>.  As adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for the Debtor's use, consumption, sale, collection or other disposition of any of the Collateral:

(a) ACB is hereby granted replacement liens in and to all of the Collateral that is created, acquired or first arises after the Petition Date (the "*Replacement Liens*") as partial adequate protection to the extent of the diminution in value of the Collateral caused by the Debtor's use, consumption, sale, collection or other disposition of any Collateral. The Replacement Liens in favor of ACB on the Collateral shall be junior in priority to the DIP Liens granted to the DIP Lender and shall be held by ACB for the benefit of itself and, as to diminution in the value of certain Pre-Petition Collateral as to which ACB holds pre-petition liens and security interests as agent, for the ratable benefit of OGB.

(b) Nothing herein shall be deemed to be a waiver by ACB of its rights to request additional or further protection of its interests in any property of Debtor, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the conversion or dismissal of the Chapter 11 Case, or to request any other relief in this case, nor shall anything herein or in any of the DIP Financing Documents constitute an admission by ACB or DIP Lender of the quantity, quality or value of any Collateral or constitute a finding of adequate protection with respect to the interests of ACB in any Collateral.  ACB shall be deemed to have reserved all rights to assert entitlement to the

-14-

protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, or other disposition of any of the Collateral, to the extent that the protection afforded by this Order to ACB's pre-petition interests in any Collateral proves to be inadequate.

    8.    <u>Carve-Out</u>.

    (a)    As used herein, "*Professional Expenses*" shall mean, collectively, compensation and expense reimbursement of professionals (including attorneys, accountants, appraisers, consultants and investment bankers) retained by Debtor (the "*Professional Persons*"), in each case only to the extent that such compensation and expense reimbursement is approved by the Court.

    (b)    The DIP Liens and Superpriority Claim conferred upon DIP Lender shall be subject and subordinate to the payment of (i) Professional Expenses of Professional Persons that are approved for payment by final order of the Court and do not exceed $40,000 in the aggregate (to the extent that retainers paid to such Professional Persons are insufficient and there are not sufficient, unencumbered funds in Debtor's estate); (ii) fees required to be paid to the Clerk of the Court; and (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in the preceding clauses (i), (ii) and (iii) are collectively called the "*Carve-Out*"); <u>provided</u>, <u>however</u>, that no proceeds of DIP Loans or any of the Collateral and no amounts received pursuant to the Carve-Out shall be used to pay Professional Expenses of any Professional Person or any other costs incurred in connection with (1) commencing or continuing any claims, causes of actions or contested matters against DIP Lender or ACB, including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (2) preventing, hindering or delaying performance or enforcement by DIP Lender or ACB of its rights or remedies under

-15-

this Order, any of the DIP Financing Documents or any of the Pre-Petition Loan Documents; (3) challenging any liens or security interests in favor of ACB or the DIP Liens or Superpriority Claim of DIP Lender; or (4) any other purpose prohibited by the DIP Financing Documents; provided, however, that the foregoing limitations shall not apply to Professional Expenses incurred in reviewing the Pre-Petition Loan Documents and the calculation of the Pre-Petition Debt and evaluating the perfection and priority of ACB's liens upon and security interests in the Pre-Petition Collateral.

(c)     DIP Lender may, in its sole discretion at any time, make one or more DIP Loans pursuant to the DIP Credit Agreement to fund the Carve-Out.  All such DIP Loans shall be entitled to all of the benefits and security of the DIP Financing Documents and this Order and shall reduce the Carve-Out to the extent of any such DIP Loans used to fund the Carve-Out. After the Carve-Out has been fully funded, the Carve-Out provided in paragraph 8(b) of this Order shall be satisfied and the DIP Liens and Superpriority Claims conferred upon DIP Lender shall no longer be subject and subordinate to payment of the Carve-Out.  The proceeds of any such DIP Loan shall be held by Debtor's counsel for the benefit of the payment of Professional Persons.  No person shall have any claim to the proceeds of any DIP Loan used to fund the Carve-Out other than (i) the Professional Persons and (ii) DIP Lender's right to refund of any excess after payment of all fees and expenses that are included in the Carve-Out as defined in paragraph 8(b).

9.     Preservation of Rights Granted Under This Order.

(a)     There shall not be entered in the Chapter 11 Case or in any successor case any order that authorizes the obtaining of credit or the incurrence of indebtedness by Debtor (or any trustee or examiner) that is (i) secured by a security, mortgage or collateral interest or lien on all or

-16-

any part of the Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority administrative status that is equal or senior to the Superpriority Claim granted to DIP Lender herein; provided, however, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations must be indefeasibly paid in full, in cash, from the proceeds of such credit or indebtedness.

(b)     If the Chapter 11 Case is dismissed or converted, then neither the dismissal nor the conversion of the Chapter 11 Case shall affect the rights of DIP Lender under the DIP Financing Documents or this Order, and all of the respective rights and remedies thereunder of DIP Lender shall remain in full force and effect as if the Chapter 11 Case had not been dismissed or converted.  It shall constitute an Event of Default if Debtor seeks, or if there is entered, any Order dismissing the Chapter 11 Case.  If an order dismissing the Chapter 11 Case is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens, Replacement Liens and Superpriority Claim granted to and conferred upon  ACB and DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such liens and Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens,  Replacement Liens and Superpriority Claim referred to herein.

-17-

(c)     The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or converting the Chapter 11 Case from Chapter 11 to Chapter 7.

(d)     The DIP Obligations shall not be discharged by the entry of any order confirming a plan of reorganization in the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, Debtor has waived such discharge.

(e)     In no event shall DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any Collateral securing any of the DIP Obligations; and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

10.     <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens shall be deemed valid, binding, enforceable and perfected upon entry of this Order.  DIP Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the DIP Liens.  If DIP Lender shall, in its discretion, choose to file any such mortgages, deeds of trust, intellectual property filings, security deeds or UCC-1 financing statements, or take any other action to validate the perfection of any part of the DIP Liens, then Debtor and its officers are directed to execute any documents or instruments as DIP Lender shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.  DIP Lender may, in its

discretion, file a certified copy of this Order in any filing office in any jurisdiction in which Debtor

is organized or has or maintains any Collateral or an office, and each filing office is directed to

accept such certified copy of this Order for filing and recording.

11.    <u>Reimbursement of Expenses</u>.  All reasonable costs and expenses incurred by DIP

Lender in connection with the negotiation and drafting of the DIP Financing Documents, or any

amendments thereto, the preservation, perfection, protection and enforcement of DIP Lender's rights

hereunder or under the DIP Financing Documents, or in the collection of the DIP Obligations,

including, without limitation, all filing and recording fees and reasonable fees and expenses of

attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with

any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date,

shall form a part of the DIP Obligations and shall be paid by Debtor (without the necessity of filing

any application with or obtaining further order from the Court) in accordance with the terms of the

DIP Financing Documents.

12.    <u>Amendments to DIP Financing Documents</u>.  Debtor and DIP Lender are hereby

authorized to implement, in accordance with the terms of the DIP Financing Documents, any

amendments to and modifications of any of the DIP Financing Documents without further order of

the Court on the following conditions:  (i) the amendment or modification must not constitute a

material change to the terms of the DIP Financing Documents, (ii) copies of the amendment or

modification must be served upon Debtor's 20 largest creditors, the U.S. Trustee, and other

interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with

the Court.  Any amendment or modification that constitutes a material change, to be effective, must

be approved by the Court (and, for purposes hereof, a "material change" shall mean a change that

-19-

operates to shorten the maturity of the DIP Obligations, increase the aggregate principal amount available under the DIP Facility, increase the rate of interest other than as currently provided in or contemplated by the DIP Financing Documents, add specific events of default, enlarge the nature and extent of default remedies available to DIP Lender following an event of default, or is a change that is both material and adverse to Debtor).

13.    <u>Events of Default; Remedies</u>.

(a)    Upon or after the occurrence of an "Event of Default" under (and as defined in) the DIP Credit Agreement, including, without limitation, an Event of Default resulting from the failure of Debtor to pay any of the DIP Credit Extensions when due; breaches of financial, affirmative, and negative covenants in the DIP Loan Documents; the falsity or material inaccuracy of any representations or warranties in the DIP Loan Documents; the appointment of a trustee or examiner with expanded powers, or dismissal or conversion to Chapter 7 of the Chapter 11 Case; confirmation of any plan of reorganization in the Chapter 11 Case, other than one providing for payment in full, on the effective date, of all of the DIP Credit Extensions owing to DIP Lender and otherwise acceptable to ACB; amendment or stay of this Order or any subsequent order on the Motion or reversal, modification, or vacation of any of such orders, whether on appeal or otherwise; the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the Collateral without DIP Lender's consent or Debtor's obtaining any financing under Section 364(d) of the Bankruptcy Code with respect to any of the Collateral; the failure of Debtor to file a motion seeking approval to sell all or substantially all of its assets under Section 363 of the Bankruptcy Code on or prior to February 19, 2010; the challenge by Debtor or any committee of the validity, extent, perfection, or priority of any liens of DIP Lender or ACB; any person or

-20-

entity holding a lien upon any pre-petition or post-petition asset of Debtor being granted relief from the automatic stay if the value of the property that is the subject of such lien is equal to or greater than $10,000; or a final financing order acceptable to DIP Lender is not entered on or before March 10, 2010; then, in any such event, DIP Lender shall be fully authorized, in its sole discretion, to terminate further DIP Credit Extensions under the DIP Facility as provided in the DIP Credit Agreement, to demand payment of all DIP Obligations, and, upon ten (10) business days' prior written notice to counsel for Debtor and the U.S. Trustee, to enforce the DIP Liens with respect to the Collateral and to take all other action and exercise all other remedies under the DIP Financing Documents and applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations, to proceed against or realize upon all or any portion of the Collateral as if the Chapter 11 Case or any superseding Chapter 7 case was not pending and otherwise to enforce the DIP Financing Documents and this Order.

(b)    The rights, remedies, powers and privileges conferred upon DIP Lender and ACB pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Financing Documents and the Pre-Petition Loan Documents.

14.    <u>Monitoring of Collateral</u>.

(a)    Representatives of DIP Lender shall be authorized to visit the business premises of Debtor to inspect any Collateral and to verify or to obtain supporting details concerning the financial information to be provided to DIP Lender hereunder or under any of the DIP Financing Documents, all as permitted by the DIP Credit Agreement.

(b)    DIP Lender shall be authorized to retain appraisers, consultants and financial advisors, at Debtor's expense, which appraisers, consultants and advisors shall be afforded

-21-

reasonable access to the Collateral and Debtor's business premises, during normal business hours, for purposes of monitoring the business of Debtor, verifying Debtor's compliance with the terms of the DIP Financing Documents and this Order, and (to the extent authorized by the DIP Financing Documents) appraising all or any part of the Collateral.

15.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this Order and the DIP Financing Documents, thereby permitting DIP Lender and ACB, *inter alia*, to receive collections of Collateral for application to the Pre-Petition Debt and the DIP Obligations as provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon default subject to the prior notice provisions of this Order.

16.    <u>Effect of Appeal</u>.  Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

(a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Lien granted or incurred by Debtor to DIP Lender prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Lien, priority or right authorized or created under the original provisions of this Order or pursuant to the DIP Financing Documents; and

(b)    any indebtedness, obligation or liability incurred by Debtor to DIP Lender under the DIP Financing Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be

-22-

entitled to all the rights, remedies, privileges and benefits, including the DIP Liens and priorities granted herein and pursuant to the DIP Financing Documents, with respect to any such indebtedness, obligation or liability.  All DIP Credit Extensions under the DIP Financing Documents are made in reliance upon this Order, and, therefore, the indebtedness resulting from such DIP Credit Extensions prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens or superpriority  administrative claim status, or (iii) be deprived of the benefit of the status of the DIP Liens and Superpriority Claim granted to DIP Lender under this Order or the DIP Financing Documents, as a result of any subsequent order in the Chapter 11 Case, or any superseding case, of Debtor.

      17.    <u>Deadline for Challenge to Pre-Petition Liens and Claims</u>.  In consideration of DIP Lender's agreement to provide DIP Credit Extensions pursuant to the DIP Financing Documents, but subject to entry of a final order on the Motion, Debtor has waived and shall be barred (a) from challenging the amount, validity, extent, perfection or priority of or seeking to set aside, avoid, offset, recharacterize or subordinate any of the Pre-Petition Debt or any liens or security interests of ACB in the Collateral and (b) from asserting against ACB or DIP Lender a claim under any lender liability theories or pursuant to Sections 105, 510, 544, 547, 548, 549 or 550 of the Bankruptcy Code.  In addition to the foregoing, the validity, extent, enforceability and perfection of the liens and security interests of ACB in the Collateral shall be subject only to the rights of any interested party (other than Debtor, subject to entry of a final order on the Motion) having standing to do so to commence an appropriate adversary proceeding or contested matter objecting to the validity or amount of the Pre-Petition Debt or the extent, validity, perfection or non-avoidability of the pre-petition liens and security interests of ACB in the Collateral, which adversary proceeding or

-23-

contested matter must be filed no later than the earlier to occur of (i) the date of any hearing with respect to approval of a sale of Debtor's assets under 11 U.S.C. § 363 or (ii) 60 days after the date of entry of this Order.  If such adversary proceeding or contested matter is not timely filed, the liens and security interests of ACB in the Collateral shall be deemed legal, valid, binding, enforceable, perfected and unavoidable and all of the Pre-Petition Debt shall be an allowed claim against the Debtor and conclusive and binding upon all parties in interest in these cases and in any superseding Chapter 7 case, including any subsequently appointed trustee, as a legal, valid, binding, enforceable claim that is not subject to offset, counterclaim, equitable subordination, recharacterization or other defense or claim.

18.    <u>Service of Order</u>.  Promptly after the entry of this Order, Debtor shall mail, by first class mail, a copy of this Order, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing, to counsel for Pre-Petition Lender and DIP Lender, the Subordinated Creditors, the U.S. Trustee, the 20 largest unsecured creditors of Debtor, the Internal Revenue Service, and all known lienholders at their respective last known addresses, and all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules, and shall file a certificate of service regarding same with the Clerk of the Court.  Such service shall constitute good and sufficient notice of the Final Hearing.

19.    <u>No Deemed Control</u>.  By consenting to this Order, making DIP Credit Extensions or administering the financing relationship with Debtor pursuant to the DIP Financing Documents, DIP Lender shall not be deemed to be in control of Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as

-24-

amended, or any similar state or federal statute) with respect to the operation or management of Debtor.

20.     <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, DIP Lender and Debtor and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed or elected for the estate of Debtor or any Chapter 7 trustee appointed in a superseding Chapter 7 case), and shall inure to the benefit of DIP Lender, ACB, Debtor and their respective successors and assigns.  In no event shall DIP Lender have any obligation to make DIP Credit Extensions to any Chapter 7 or Chapter 11 trustee appointed or elected for the estate of Debtor.

21.     <u>Final Hearing</u>.   The Final Hearing shall be held at _____ o'clock _.m., on _____, 2010, at the U.S. Bankruptcy Court, Second Floor Courtroom, Lewis R. Morgan Federal Building, 18 Greenville Street, Newnan, Georgia. If any or all of the provisions of this Order are modified, vacated or stayed as the result of any objection timely filed and asserted at the Final Hearing, then, without limiting the provisions of paragraph 16 hereof, any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Liens and superiority claim status granted herein and pursuant to the DIP Financing Documents with respect to all such DIP Obligations.

22.     <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Order, such party shall be authorized to assert such objection at the Final Hearing, provided that a written statement setting forth the basis for such objection is filed with the Court, and

concurrently served upon the Office of the United States Trustee at Room 362, U.S. Courthouse, 75

Spring Street SW, Atlanta, Georgia 30303; counsel for Debtor, Scroggins & Williamson, 127

Peachtree Street NE, 1500 Candler Building, Atlanta, Georgia 30303, Attn: John T. Sanders IV,

Esq.; and counsel for DIP Lender and ACB, Parker Hudson Rainer & Dobbs LLP, 1500 Marquis

Two Tower, 285 Peachtree Center Avenue, Atlanta, Georgia  30303, Attention:  James S. Rankin,

Jr., Esq., in each case so that such objections and responses are filed on or before 5:00 p.m.,

prevailing Eastern time on _____ __, 2010.  Unless an objecting party shall be and appear

at the Final Hearing to assert the basis for such objection before the Court, such objection shall be

deemed to have been waived and abandoned by such objecting party.

        23.    <u>Inconsistencies</u>.  To the extent that any provisions in the DIP Credit Agreement are

inconsistent with any of the provisions of this Order, the provisions of this Order shall govern and

control.

        **IT IS SO ORDERED,** this _____ day of February, 2010.


        _____
        **HONORABLE W. HOMER DRAKE, JR.**
        **UNITED STATES BANKRUPTCY COURT**


-26-

*DRAFT - FOR DISCUSSION PURPOSES ONLY*

_____

MC PRECAST, INC., as Borrower

_____

_____


## POST-PETITION LOAN AND SECURITY AGREEMENT

Dated:  February 10, 2010

Up to $500,000

_____

_____


_____

ATLANTIC CAPITAL BANK, as Lender

_____

# TABLE OF CONTENTS

SECTION 1.    DISCRETIONARY DIP FACILITY ............................................................... - 1 -
1.1   Discretionary Line of Credit .................................................................................. - 1 -
SECTION 2.    INTEREST, FEES AND CHARGES ............................................................ - 2 -
2.1   Interest. ................................................................................................................... - 2 -
2.2   Fees. ........................................................................................................................ - 3 -
2.2.1  Audit and Appraisal Fees.  ..................................................................................... - 3 -
2.3   Computation of Interest and Fees .......................................................................... - 3 -
2.4   Reimbursement Obligations. .................................................................................. - 3 -
2.5   Maximum Interest ................................................................................................... - 4 -
SECTION 3.    LOAN ADMINISTRATION ....................................................................... - 4 -
3.1   Borrowing and Funding Loans ............................................................................... - 4 -
3.2   All Loans to Constitute One Obligation ................................................................. - 5 -
SECTION 4.    PAYMENTS ................................................................................................ - 5 -
4.1   General Payment Provisions ................................................................................... - 5 -
4.2   Repayment of Loans. .............................................................................................. - 5 -
4.3   Payment of Other Obligations ................................................................................ - 5 -
4.4   Marshaling; Payments Set Aside ............................................................................ - 5 -
4.5   Nature and Extent of Borrower's Liability ............................................................. - 5 -
4.6   Application of Payments and Collections ............................................................... - 6 -
4.7   Loan Account; Account Stated. .............................................................................. - 6 -
SECTION 5.    DIP TERM AND TERMINATION OF DIP FACILITY .............................. - 7 -
5.1   DIP Term ................................................................................................................. - 7 -
5.2   Termination of DIP Facility. .................................................................................. - 7 -
SECTION 6.    COLLATERAL AND ADMINISTRATIVE PRIORITY ............................. - 7 -
6.1   Grant of Security Interest in and Liens Upon Collateral ....................................... - 7 -
6.2   Other Collateral ...................................................................................................... - 8 -
6.3   Lien on Real Estate ................................................................................................. - 8 -
6.4   Lien Perfection; Further Assurances ...................................................................... - 8 -
6.5   Liens Under Financing Orders ............................................................................... - 9 -
6.6   Lien Priority ............................................................................................................ - 9 -
6.7   Administrative Priority ........................................................................................... - 9 -
SECTION 7.    COLLATERAL ADMINISTRATION ......................................................... - 9 -
7.1   General Provisions .................................................................................................. - 9 -
7.2   Administration of Accounts .................................................................................. - 10 -
SECTION 8.    REPRESENTATIONS AND WARRANTIES ............................................ - 10 -
8.1   General Representations and Warranties .............................................................. - 10 -
8.2   Reaffirmation of Representations and Warranties ................................................ - 11 -
SECTION 9.    COVENANTS AND CONTINUING AGREEMENTS ............................... - 11 -
9.1   Affirmative Covenants ......................................................................................... - 11 -
9.2   Negative Covenants .............................................................................................. - 13 -
SECTION 10.    CONDITIONS PRECEDENT ................................................................... - 14 -
10.1   Conditions Precedent to Initial Credit Extensions ............................................... - 14 -
10.2   Conditions Precedent to All Credit Extensions .................................................... - 15 -
10.3   Limited Waiver of Conditions Precedent .............................................................. - 15 -
SECTION 11.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT ...... - 16 -
11.1   Events of Default ................................................................................................... - 16 -
11.2   Acceleration of the Obligations ............................................................................ - 17 -
11.3   Remedies ............................................................................................................... - 17 -

**11.4**    **Setoff.** ................................................................................................................ - 18 -
**11.5**    **Remedies Cumulative; No Waiver.** .................................................................... - 18 -
SECTION 12.          MISCELLANEOUS ......................................................................... - 19 -
12.1      Power of Attorney ................................................................................................. - 19 -
12.2      General Indemnity ................................................................................................ - 20 -
12.3      Survival of All Indemnities .................................................................................. - 20 -
12.4      Indulgences Not Waivers ...................................................................................... - 20 -
12.5      Modification of Agreement ................................................................................... - 20 -
12.6      Severability ........................................................................................................... - 20 -
12.7      Cumulative Effect; Conflict of Terms .................................................................. - 20 -
12.8      Execution in Counterparts; Electronic Signatures ............................................... - 20 -
12.9      Lender's Consent .................................................................................................. - 21 -
12.10     Notices .................................................................................................................. - 21 -
12.11     Time of Essence ................................................................................................... - 21 -
12.12     Entire Agreement .................................................................................................. - 21 -
12.13     Interpretation ........................................................................................................ - 21 -
12.14     Governing Law ..................................................................................................... - 21 -
12.15     Successors and Assigns ........................................................................................ - 21 -
12.16     Waivers by Borrower ............................................................................................ - 21 -

<u>EXHIBITS</u>

Exhibit A        Budget

## POST-PETITION LOAN AND SECURITY AGREEMENT

**THIS POST-PETITION LOAN AND SECURITY AGREEMENT** is made on February 10, 2010, between **MC PRECAST, INC.,** a Georgia corporation and debtor-in-possession ("Borrower"), and **ATLANTIC CAPITAL BANK**, a Georgia bank ("Lender").  Capitalized terms used in this Agreement that are not otherwise defined in this Agreement shall have the meanings assigned to them in Appendix A, General Definitions.

### R e c i t a l s:

Borrower is a debtor-in-possession under Chapter 11 of the Bankruptcy Code in a case (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division (together with any other court having jurisdiction over the Chapter 11 Case or any proceedings therein from time to time, the "Court"), as Case No. 10-10466-whd.  Borrower has requested that Lender extend financing to Borrower in connection with the Chapter 11 Case in accordance with the provisions of this Agreement.

In its sole and absolute discretion, Lender is willing to make secured loans to Borrower, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in orders of the Court approving the proposed financing.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## SECTION 1.   DISCRETIONARY DIP FACILITY

Subject to the terms and conditions of, and in reliance upon the representations and warranties made in, this Agreement and the other Loan Documents, Lender agrees, to the extent and in the manner hereinafter set forth, to establish the DIP Facility in favor of Borrower, as follows:

### 1.1      Discretionary Line of Credit.

1.1.1   Line of Credit.  In its sole and absolute discretion, Lender may, upon the terms and subject to the conditions set forth herein, make one or more Loans to Borrower on any Business Day during the period from the date hereof through the day before the last day of the DIP Term, not to exceed the Maximum Facility Amount in aggregate principal amount outstanding at any time, which Loans may be repaid and borrowed in accordance with the provisions of this Agreement.  For the avoidance of doubt, Lender shall not be required to make any Loan, whether to make any Loan (and the amount of any Loan) shall be a matter committed to the sole and absolute discretion of Lender, Borrower shall have no right to expect that Lender shall make any particular Loan that it may request, and Borrower shall not have any claim or cause of action whatsoever against Lender arising out of or relating to any refusal of Lender to make any Loan that may be requested by Borrower. The Loans shall bear interest as set forth in **Section 2.1** hereof.

1.1.2   Use of Proceeds.  The proceeds of the Loans shall be used by Borrower during the pendency of the Chapter 11 Case exclusively for one or more of the following purposes: (i) to pay the Pre-Petition Debt to the extent authorized by the Court; (ii) to pay expenses described (and not to exceed 110% of the amount provided for) in the Budget or, with Lender's consent after the occurrence of an

Event of Default, to fund the costs of an orderly liquidation of the Collateral; (iii) to pay Adequate Protection Claims, but only to the extent authorized by the Court; (iv) to pay U.S. Trustee Fees; (v) to pay Professional Expenses of Professional Persons subject to any limitations in the Financing Orders, allowance by the Court and Borrower's and Lender's receipt of an itemized billing and expense statement from such Professional Person; (vi) to pay any of the Obligations; (vii) to pay Sales Taxes and, to the extent secured by a Lien senior to Lender's Liens thereon, property taxes with respect to any Collateral; and (viii) to pay other expenses authorized by the Court in orders entered in the Chapter 11 Case that are acceptable to Lender.  Notwithstanding anything to the contrary contained herein, in no event shall proceeds of Loans be used to pay Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages from Lender on account of any alleged cause of action arising on, before or after the Petition Date; (b) invalidating, setting aside, recharacterizing, avoiding or subordinating, in whole or in part, (i) any of the Pre-Petition Debt or Obligations, or (ii) any of the Liens in any of the Collateral granted to Lender under this Agreement or the Financing Orders or under any of the Pre-Petition Loan Documents; (c) declaring any of the Loan Documents or Pre-Petition Loan Documents to be invalid, not binding or unenforceable in any respect; (d) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the Loan Documents or Pre-Petition Loan Documents, or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (e) declaring any Liens granted or purported to be granted under any of the Loan Documents or Pre-Petition Loan Documents to have a priority other than the priority set forth therein; (f) objecting to the amount or method of calculation by Lender of the Pre-Petition Debt, or any accounting rendered by Lender with respect to any of those obligations; or (g) seeking to use the cash proceeds of any of the Collateral without the prior written consent of Lender; provided, however, that the foregoing limitations shall not apply to Professional Expenses incurred in reviewing the Pre-Petition Loan Documents and the calculation of the Pre-Petition Debt and evaluating the perfection and priority of Lender's liens upon and security interests in the Collateral existing on the Petition Date. Nothing in this **Section 1.1.2** shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Court.

1.1.3    Noteless Agreement.  The Loans shall be evidenced by the records of Lender and, unless otherwise required by Lender, shall not be evidenced by any note or other instrument.  If at any time Lender requests Borrower to execute any note or other instrument to evidence any of the Loans (a "DIP Note"), Borrower shall promptly comply with Lender's request and execute and deliver to Lender a DIP Note in form and substance satisfactory to Lender.

## SECTION 2.    INTEREST, FEES AND CHARGES

### 2.1    Interest.

2.1.1    Rate of Interest.  Borrower agrees to pay interest in respect of all unpaid principal amounts of the Loans from the respective dates such principal amounts are advanced until paid (whether at stated maturity, on acceleration or otherwise) at a fixed rate equal to eight percent (8%) per annum.

2.1.2    Default Rate of Interest.  From and after the occurrence of any Event of Default, the principal amount of the Obligations (and, to the extent permitted by Applicable Law, all past due interest) shall bear interest at a fixed rate equal to twelve percent (12%) per annum (the "Default Rate"). To the fullest extent permitted by Applicable Law, the Default Rate shall apply and accrue on any judgment entered with respect to any of the Obligations.  Borrower acknowledges that the cost and expense to Lender attendant upon the occurrence of an Event of Default are difficult to ascertain or

estimate and that the Default Rate is a fair and reasonable estimate to compensate Lender for such added cost and expense.

**2.2**    **Fees.**

2.2.1    Audit and Appraisal Fees.  Borrower shall be obligated to reimburse Lender for all reasonable costs and expenses incurred by Lender in connection with all audits and appraisals of any Obligor's books and records and such other matters pertaining to any Obligor or any Collateral as Lender shall deem appropriate.

2.2.2    General Provisions.  All fees shall be fully earned by Lender pursuant to the foregoing provisions of this Agreement on the due date thereof and, except as otherwise set forth herein or required by Applicable Law, shall not be subject to rebate, refund or proration.  All fees provided for in this **Section 2.2** are and shall be deemed to be compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.

**2.3**    **Computation of Interest and Fees.**  Interest shall be calculated on a daily basis, commencing on the date hereof, and shall be payable monthly, in arrears, on the first day of each month. All interest, fees and other charges provided for in this Agreement shall be calculated daily and shall be computed on the actual number of days elapsed over a year of 360 days.  Borrower acknowledges that the calculation of interest on the basis of a 360-day year, as opposed to a year of 365 days, results in a higher effective rate of interest hereunder.

**2.4**    **Reimbursement Obligations.**

2.4.1    Borrower shall reimburse Lender for all reasonable legal, accounting, appraisal and other fees and expenses incurred by Lender (including fees and expenses of Lender Professionals) in connection with (i) the negotiation and preparation of any of the Loan Documents, any amendment or modification thereto, any waiver of any Default or Event of Default thereunder, or any restructuring or forbearance with respect thereto; (ii) the administration of the Loan Documents and the transactions contemplated thereby; (iii) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral; (iv) any inspection of or audits conducted with respect to any of Borrower's books and records or any of the Collateral; (v) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral; (vi) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, any Obligor or any other Person) in any way arising out of or relating to any of the Collateral (or the validity, perfection or priority of any of Lender's Liens thereon), any of the Loan Documents or the validity, allowance or amount of any of the Obligations; (vii) the protection or enforcement of any rights or remedies of Lender in the Chapter 11 Case or any other Insolvency Proceeding; and (viii) any other action taken by Lender to enforce any of the rights or remedies of Lender against any Obligor or any Account Debtors to enforce collection of any of the Obligations or payments with respect to any of the Collateral.  All amounts chargeable to Borrower under this **Section 2.4** shall constitute Obligations that are secured by all of the Collateral and shall be payable **on demand** to Lender.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

2.4.2    If at any time Lender shall agree to indemnify any Person against losses or damages that such Person may suffer or incur in its dealings or transactions with Borrower, or shall guarantee any liability or obligation of Borrower to such Person, or otherwise shall provide assurances of Borrower's payment or performance under any agreement with such Person, then Lender shall give prompt notice thereof to Borrower and Borrower shall indemnify and defend Lender and shall hold

- 3 -

Lender harmless from and against any and all liability it may have under any such indemnity, guaranty or assurance, and any amounts so paid by Lender shall be repaid to Lender immediately by Borrower. Borrower's agreement to indemnify and defend Lender shall constitute part of the Obligations that are secured by the Collateral, and Borrower shall repay, **on demand**, any amount so paid or any liability incurred by Lender in connection with any such indemnity, guaranty or assurance. Nothing herein shall be construed to impose upon Lender any obligation to provide any such indemnity, guaranty or assurance. The foregoing agreement of Borrower shall apply whether or not such indemnity, guaranty or assurance is in writing or oral and regardless of Borrower's knowledge of the existence thereof, and shall be in addition to any of the provisions of the Loan Documents regarding reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

2.5    **Maximum Interest**.  Regardless of any provision contained in this Agreement or any of the other Loan Documents, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any of the other Loan Documents and that are deemed interest under Applicable Law exceed the highest rate permissible under any Applicable Law.  No agreements, conditions, provisions or stipulations contained in this Agreement or any of the other Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations, or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrower of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive in any event, interest or any charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to herein collectively as "Interest") in excess of the Maximum Rate and in no event shall Borrower be obligated to pay Interest exceeding such Maximum Rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay Interest exceeding the Maximum Rate shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such Maximum Rate.   If any Interest is charged or received in excess of the Maximum Rate ("Excess"), Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and such Excess, to the extent received, shall be applied first to reduce the principal Obligations and the balance, if any, returned to Borrower, it being the intent of the parties hereto not to enter into a usurious or otherwise illegal relationship.  The right to accelerate the maturity of any of the Obligations does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and Lender does not intend to collect any unearned interest in the event of any such acceleration.  For the purpose of determining whether or not any Excess has been contracted for, charged or received by Lender, all interest at any time contracted for, charged or received from Borrower in connection with any of the Loan Documents shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations.  The provisions of this **Section 2.5** shall be deemed to be incorporated into every Loan Document (whether or not any provision of this **Section 2.5** is referred to therein).   All such Loan Documents and communications relating to any Interest owed by Borrower, and all figures set forth therein shall, for the sole purpose of computing the extent of Obligations, be automatically recomputed by Borrower, and by any court considering the same, to give effect to the adjustments or credits required by this **Section 2.5**.

## SECTION 3.    LOAN ADMINISTRATION

3.1    **Borrowing and Funding Loans**.   Borrowings under the DIP Facility established pursuant to **Section 1** hereof may be made and funded, in the sole and absolute discretion of Lender, upon request by Borrower. Unless payment is otherwise timely made by Borrower, the becoming due of any amount required to be paid under this Agreement or any of the other Loan Documents with respect to the Obligations (whether as principal, accrued interest, fees or other charges) shall be deemed irrevocably to be a request for Loans on the due date of, and in an aggregate amount required to pay, such principal,

accrued interest, fees or other charges, and the proceeds of such Loans may be disbursed by way of direct payment of the relevant Obligation.  Lender shall not have any obligation to Borrower to honor any actual or deemed request for a Loan, but may do so in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default.

      **3.2**    **All Loans to Constitute One Obligation**.  The Loans shall constitute one general obligation of Borrower and shall be secured by all Liens granted to or otherwise conferred upon Lender in respect of any or all Collateral pursuant to the terms of any of the Loan Documents or Financing Orders.

## SECTION 4.    PAYMENTS

      **4.1**    **General Payment Provisions**.  All payments of principal and interest on the Loans and other Obligations shall be paid to Lender in Dollars without any offset or counterclaim and free and clear of (and without deduction for) any present or future Taxes.

      **4.2**    **Repayment of Loans.**

      4.2.1    Payment of Principal.  The principal amount of the Loans shall be paid by Borrower to Lender immediately upon (a) each receipt by Lender or Borrower of any proceeds of any of the Collateral, to the extent of such proceeds, unless and to the extent such proceeds are authorized to be used by Borrower pursuant to the Financing Orders, and (b) the Termination Date.

      4.2.2    Payment of Interest.  Interest accrued on each Loan shall be due and payable on the fifteenth (15th) calendar day of each month (for the immediately preceding month), computed through the last calendar day of the preceding month.  All accrued interest shall also be paid by Borrower on the Termination Date.

      4.2.3    Promise to Pay.  Borrower hereby promises to repay to Lender the Loans and all interest, fees, charges and other Obligations.

      **4.3**    **Payment of Other Obligations**.  The balance of the Obligations requiring the payment of money, including Extraordinary Expenses incurred by Lender, shall be repaid by Borrower to Lender as provided in this Agreement, as and when provided in the Loan Documents, or, if no date of payment is otherwise specified in the Loan Documents, **on demand**.

      **4.4**    **Marshaling; Payments Set Aside**.  Lender shall not be under any obligation to marshal any assets in favor of any Obligor or against or in payment of any or all of the Obligations.  To the extent that Borrower makes a payment or payments to Lender or Lender receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or payments or the proceeds of Collateral or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.  The provisions of the immediately preceding sentence of this **Section 4.4** shall survive Full Payment of the Obligations.

      **4.5**    **Nature and Extent of Borrower's Liability**

      4.5.1.    Unconditional Nature of Liability.  Borrower hereby unconditionally and irrevocably agrees that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, or interest owed on, any of the Loans or other Obligations, Borrower

shall forthwith pay the same, without notice or demand. Borrower's liability hereunder with respect to the Loans and other Obligations shall, to the fullest extent permitted by Applicable Law, be unconditional irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Obligations or of any promissory note or other document evidencing all or any part of the Obligations, (ii) the absence of any attempt to collect any of the Obligations from any other Obligor or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance or granting of any indulgence by Lender with respect to any of the Obligations or any Instrument or agreement evidencing or securing the payment of any of the Obligations, or any other agreement now or hereafter executed by Borrower and delivered to Lender, (iv) the failure by Lender to take any steps to perfect or maintain the perfected status of its security interest in or Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Obligations, or Lender's release of any Collateral or of its Liens upon any Collateral, (v) the release or compromise, in whole or in part, of the liability of any Obligor for the payment of any of the Obligations, (vi) any amendment or modification of any of the Loan Documents or waiver of any Default or Event of Default thereunder, (vii) any increase in the amount of the Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, or any decrease in the same, or (viii) any other circumstance that might constitute a legal or equitable discharge or defense of any Obligor.  At any time an Event of Default exists, Lender may proceed directly and at once, without notice to any Obligor, against any or all of Obligors to collect and recover all or any part of the Obligations, without first proceeding against any other Obligor or against any Collateral or other security for the payment or performance of any of the Obligations, and Borrower waives any provision of the Loan Documents or Applicable Law that might otherwise require Lender under Applicable Law to pursue or exhaust its remedies against any Collateral or Obligor before pursuing Borrower or another Obligor.  Borrower consents and agrees that Lender shall be under no obligation to marshal any assets in favor of any Obligor or against or in payment of any or all of the Obligations.

       4.5.2.   <u>No Reduction in Liability for Obligations</u>.  No payment or payments made by an Obligor or received or collected by Lender from any Collateral or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of Borrower under this Agreement, and Borrower shall remain liable for the payment and performance of all Loans and other Obligations until Full Payment of the Obligations.

       4.5.3.   <u>Subordination</u>.  Borrower hereby subordinates any claims, including any right of payment, subrogation, contribution and indemnity, that it may have from or against any other Obligor, and any successor or assign of any other Obligor, including any trustee, receiver or debtor-in-possession, howsoever arising, due or owing or whether heretofore, now or hereafter existing, to the Full Payment of all of the Pre-Petition Debt and all of the Obligations.

       **4.6**      **Application of Payments and Collections.**  Borrower irrevocably waives the right to direct the application of any and all payments and Collateral proceeds at any time or times received by Lender from or on behalf of Borrower, and Borrower does hereby irrevocably agree that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and Collateral proceeds received at any time or times hereafter by Lender against the Pre-Petition Debt or the Obligations, in such manner as Lender may deem advisable, notwithstanding any entry by Lender upon any of its books and records.

       **4.7**      **Loan Account; Account Stated.**

       4.7.1   <u>Loan Account</u>.  Lender may maintain an account (the "Loan Account") evidencing the Obligations of Borrower resulting from each Loan owing to Lender from time to time,

- 6 -

including the amount of principal and interest payable to Lender from time to time hereunder and, to the extent executed and delivered to Lender, under any Note. Any failure of Lender to record in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower hereunder (or under any applicable Note) to pay any amount owing hereunder to Lender.

4.7.2    Entries Binding.    The entries made in the Loan Account shall constitute rebuttably presumptive evidence of the information contained therein; provided, however, that if a copy of information contained in the Loan Account is provided to any Obligor, or any Obligor inspects the Loan Account, at any time or from time to time, then the information contained in the Loan Account shall be conclusive and binding on such Obligor for all purposes absent manifest error, unless such Obligor notifies Lender in writing within 30 days after such Obligor's receipt of such copy or such Obligor's inspection of the Loan Account that such Obligor disputes the information contained therein.

## SECTION 5.    DIP TERM AND TERMINATION OF DIP FACILITY

**5.1    DIP Term**.    Subject to Lender's right to decline to make any Loan to Borrower in its sole and absolute discretion, the DIP Facility shall be in effect for the DIP Term. The DIP Term may be extended by written agreement between Borrower and Lender.

### 5.2    Termination of DIP Facility.

5.2.1    Termination by Parties.    After the occurrence of an Event of Default, Lender may terminate the DIP Facility at any time without notice to Borrower. Borrower may terminate the DIP Facility at any time upon 20 days prior written notice to Lender; provided, however, no such termination by Borrower shall be effective until Full Payment of the Obligations. Any notice of termination given by Borrower shall be irrevocable unless Lender otherwise agrees in writing.

5.2.2    Automatic Termination.    The DIP Facility shall also terminate if and when the Termination Date occurs other than as a result of termination by Lender or Borrower pursuant to **Section 5.2.1.**

5.2.3    Effect of Termination.    On the Termination Date, all of the Obligations (including Contingent Obligations owing to Lender) shall be immediately due and payable. All undertakings, agreements, covenants, warranties and representations of Borrower contained in the Loan Documents shall survive any such termination and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents notwithstanding such termination until Full Payment of the Obligations. Notwithstanding anything to the contrary in this Agreement, the provisions of **Sections 2.4, 4.4, 12.2** and this **Section 5.2.3** and all obligations of Borrower to indemnify Lender pursuant to this Agreement shall in all events survive any termination of the DIP Facility and shall survive any release or termination of Liens by Lender.

## SECTION 6.    COLLATERAL AND ADMINISTRATIVE PRIORITY

**6.1    Grant of Security Interest in and Liens Upon Collateral**.    To secure the prompt payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all of Borrower's Property and interests in Property, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or is created or acquired after the Petition Date) and wherever located, including, without limitation:

(i)      all Accounts;

(ii)    all Inventory;

(iii)    all Equipment;

(iv)    all General Intangibles;

(v)    all Deposit Accounts;

(vi)    all Commercial Tort Claims;

(vii)    all Instruments;

(viii)    all Chattel Paper;

(ix)    all Documents;

(x)    all Investment Property;

(xi)    all Supporting Obligations;

(xii)    all Letter-of-Credit Rights;

(xiii)    all monies and other Property of any kind, now or at any time or times hereafter in the possession or under the control of Lender or a bailee or Affiliate of Lender, including any Cash Collateral;

(xiv)    all cash and non-cash proceeds of (i) through (xiii) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral; and

(xv)    all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials and records) of Borrower pertaining to any of (i) through (xiv) above.

**6.2    Other Collateral.**  In addition to the items of Property referred to in **Section 6.1** above, the Obligations shall also be secured by the Cash Collateral to the extent provided herein and all of the other items of Property from time to time described in any of the Security Documents as security for any of the Obligations.

**6.3    Lien on Real Estate.**  The due and punctual payment and performance of the Obligations shall also be secured by a Lien upon the Newnan Plant and any other Real Estate.  If so requested by Lender, Borrower shall execute and deliver to Lender a Mortgage in respect to any such Real Estate, which shall be duly recorded, at Borrower's expense, in each office where such recording is required to constitute a fully perfected Lien under applicable non-bankruptcy law upon the Real Estate.  Irrespective of Borrower's execution and delivery of any Mortgage with respect to the Newnan Plant or any other Real Estate, the Liens in favor of Lender pursuant to the Financing Orders with respect to the assets of Borrower, including the Newnan Plant, shall be automatically perfected without the necessity of the execution, delivery or recording of any Mortgage.

**6.4    Lien Perfection; Further Assurances.**    Promptly after Lender's request therefor, Borrower shall execute or cause to be executed and deliver to Lender (and consents to Lender's filing without Borrower's signature where permitted by Applicable Law) such instruments, assignments, title

certificates or other documents as are necessary under the UCC or other applicable non-bankruptcy law (including any motor vehicle certificates of title act) to perfect (or continue the perfection of) Lender's Lien upon the Collateral under applicable non-bankruptcy law, and shall take such other action as may be requested by Lender to give effect to or carry out the intent and purposes of this Agreement.  Irrespective of any steps taken by Lender to perfect any security interest or other Lien granted or conveyed to Lender pursuant to any of the Loan Documents, all security interests and other Liens at any time granted or conveyed, or otherwise conferred upon, Lender pursuant to the Loan Documents or the Financing Orders shall be automatically perfected as provided in the Financing Orders without the necessity of the filing or recording of any other instrument or agreement, the taking of possession of any of the Collateral or any other action on the part of Lender.  Borrower hereby authorizes Lender to execute and file any such financing statement on Borrower's behalf.

      **6.5**    **Liens Under Financing Orders**.  The security interests and other Liens granted to or conferred upon Lender pursuant to the provisions of this **Section 6** and pursuant to any of the other Loan Documents shall be in addition to all Liens conferred upon Lender pursuant to the terms of the Financing Orders.

      **6.6**    **Lien Priority**.  The Liens and security interests granted to Lender pursuant to the provisions of this **Section 6** and pursuant to any of the other Loan Documents shall be first priority Liens and security interests in the Collateral, except as otherwise provided in the Financing Orders.

      **6.7**    **Administrative Priority.**  Subject to the entry of the Interim Financing Order, the Obligations shall constitute allowed super-priority administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against Borrower of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code.

## SECTION 7.    COLLATERAL ADMINISTRATION

      **7.1**    **General Provisions.**

          7.1.1    <u>Insurance of Collateral;  Condemnation Proceeds</u>.  Borrower shall maintain and pay for insurance upon all Collateral, wherever located, covering casualty, hazard, public liability, theft, malicious mischief, and such other risks in such amounts and with such insurance companies as are reasonably satisfactory to Lender.  All proceeds payable under each such policy shall be payable to Lender for application to the Pre-Petition Debt or the Obligations.  If Borrower fails to provide and pay for such insurance, Lender may, at its option, but shall not be required to, procure the same and charge Borrower therefor.  At any time that an Event of Default exists, only Lender shall be authorized to settle, adjust and compromise such claims.  Lender shall have all rights and remedies with respect to such policies of insurance as are provided for in this Agreement and the other Loan Documents.

          7.1.2    <u>Protection of Collateral</u>.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any Applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by Lender to any Person to realize upon any Collateral shall be borne and paid by Borrower.  If Borrower fails to pay promptly any portion thereof when due, Lender may, at its option, but shall not be required to, pay the same and charge Borrower therefor.  Lender shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in Lender's actual possession) or for any diminution in the value

thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at Borrower's sole risk.

       7.1.3    <u>Defense of Title to Collateral</u>.  Borrower shall at all times defend its title to the Collateral and Lender's Liens therein against all Persons and all claims and demands whatsoever.

**7.2**      **<u>Administration of Accounts.</u>**

       7.2.1    <u>Records and Schedules of Accounts</u>.  Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit to Lender on such periodic basis as Lender shall request a sales and collections report for the preceding period, in a form satisfactory to Lender.

       7.2.2    <u>Account Verification</u>.  Whether or not a Default or an Event of Default exists, Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone, telegraph or otherwise.  Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.

       7.2.3    <u>Collection of Accounts and Proceeds of Collateral</u>.  To expedite collection, Borrower shall endeavor in the first instance to make collection of Borrower's Accounts for Lender. Lender retains the right at all times after the occurrence of a Default or an Event of Default to notify Account Debtors of Borrower that Accounts have been assigned to Lender and to collect Accounts directly in its own name and to charge to Borrower the collection costs and expenses incurred by Lender, including reasonable attorneys' fees.

**SECTION 8.    REPRESENTATIONS AND WARRANTIES**

    **8.1**      **<u>General Representations and Warranties</u>**.   To induce Lender to enter into this Agreement, Borrower warrants and represents to Lender that:

       8.1.1    <u>Organization and Qualification</u>.  Borrower is duly organized, validly existing and in good standing under the laws of the state of Georgia, has the power to own Properties and to transact the business in which it is presently engaged or proposed to be engaged and is duly qualified and in good standing in each jurisdiction in which it presently is, or proposes to be, engaged in business.

       8.1.2    <u>Power and Authority</u>.  The execution, delivery and performance by Borrower of the Loan Documents are within Borrower's corporate power, has been duly authorized by all necessary or proper corporate action and, on the date of initial funding of Loans hereunder, will be authorized by the Interim Financing Order pursuant to Sections 363 and 364 of the Bankruptcy Code; are not in contravention of any provision of its Organizational Documents; will not violate any Applicable Law (following entry of the Interim Financing Order); will not conflict with any Material Contract of Borrower; and does not require the consent or approval of any Governmental Authority or any other Person other than the entry by the Court of the Interim Financing Order and thereafter the Final Financing Order.

       8.1.3    <u>Enforceable Agreements</u>.  Each of the Loan Documents has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

- 10 -

8.1.4    <u>Priority of Liens</u>.  Upon entry of the Interim Financing Order, and thereafter upon entry of the Final Financing Order, the Liens granted pursuant to the Loan Documents constitute valid, enforceable, and perfected Liens on the Collateral, and such Liens constitute first priority Liens except as otherwise provided in the Financing Orders.

8.1.5    <u>Compliance With Laws</u>.  All of Borrower's business, operations and Properties are conducted, maintained and owned in accordance with Applicable Law, including all Environmental Laws, except to the extent that any such noncompliance could not reasonably be expected to have a Material Adverse Effect.

8.1.6    <u>Governmental Approvals</u>.  Borrower has obtained and holds in full force and effect all Governmental Approvals necessary for the operation of its businesses as presently and proposed to be conducted, except to the extent that the failure to obtain same could not reasonably be expected to have a Material Adverse Effect.

8.1.7    <u>No Adverse Changes</u>.  Since the Petition Date, no event has occurred that has or could reasonably be expected to have a Material Adverse Effect.

8.1.8    <u>Brokers</u>.  There are no claims for brokerage commissions, finders' fees or investment banking fees in connection with the transactions contemplated by this Agreement or any of the other Loan Documents.

8.1.9    <u>No Default</u>.  No Default or Event of Default exists at the time, or would result from the funding, of any Loan or other extension of credit hereunder.

8.1.10    <u>Burdensome Contracts</u>.  Borrower is not a party or subject to any contract, agreement, or charter or other corporate restriction, which has or could be reasonably expected to have a Material Adverse Effect except, in the case of a contract or agreement, such contract or agreement is executory and may be rejected pursuant to Section 365 of the Bankruptcy Code in the Chapter 11 Case and Borrower intends to reject such contract or agreement.

8.1.11    <u>ERISA</u>.  Borrower does not have any Plan on the date hereof.

**8.2    <u>Reaffirmation of Representations and Warranties</u>**.  All of the foregoing representations and warranties made by Borrower in this Agreement or in any of the other Loan Documents shall survive the execution and delivery of this Agreement and such other Loan Documents, and shall be deemed to have been remade and reaffirmed on each day that any Obligations are outstanding or that Borrower requests or is deemed to have requested a Loan under the DIP Facility, except for changes that may occur after the date hereof in the Ordinary Course of Business as long as Lender has consented to such changes or such changes are not violative of any provision of this Agreement.

## SECTION 9.    COVENANTS AND CONTINUING AGREEMENTS

**9.1    <u>Affirmative Covenants</u>**.  During the DIP Term and thereafter until Full Payment of the Obligations, Borrower covenants to:

9.1.1    <u>Business and Existence</u>.  Preserve and maintain its corporate existence and all rights, privileges, and franchises in connection therewith, and maintain its qualification and good standing in all states in which such qualification is necessary to the ownership of its Properties or the conduct of its businesses.

9.1.2    <u>Adherence to Budget</u>.  Provide Lender with a weekly written variance report reflecting such Borrower's variance, if any, from the Interim Budget or the Supplemental Budget with respect to receipts, disbursements and revenue.  Borrower further covenants to maintain, with respect to sales, collections and expenses, a negative variance from the Budget of not more than 10% for any calendar week.

9.1.3    <u>Business Records</u>.  Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all of its financial transactions.

9.1.4    <u>Visits and Inspections; Financial Reporting</u>.  Permit representatives of Lender, from time to time, as often as may be reasonably requested, but only during normal business hours, to visit and inspect the Properties of Borrower, inspect and make extracts from Borrower's books and records, and discuss with Borrower's officers, its employees and its independent accountants, Borrower's business, assets, liabilities, financial condition, business prospects and results of operations.  Borrower and its consultants and representatives shall also attend such periodic conference calls or meetings as may be reasonably requested by Lender, during normal business hours and subject to agreement as to time and place, to review Borrower's recent financial performance, projections and progress toward consummating a sale of its assets under Section 363 of the Bankruptcy Code.  Borrower shall continue to provide to Lender the same periodic financial reporting (including reports with respect to accounts receivable, accounts payable and project status reports) as is required under the Pre-Petition Loan Documents.

9.1.5    <u>Further Assurances</u>.  At Lender's request, promptly execute or cause to be executed and deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of this Agreement, any of the other Loan Documents or the Financing Orders.

9.1.6    <u>Compliance With Bankruptcy Code, Rules and Orders</u>.  Comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Interim Financing Order, the Final Financing Order and all other orders entered by the Court in the Chapter 11 Case.

9.1.7    <u>Insurance</u>.  In addition to the insurance required herein with respect to the Collateral, maintain with financially sound and reputable insurers, insurance with respect to its Properties and business against such casualties and contingencies of such type (including product liability, business interruption, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts as is customary in the business of Borrower.

9.1.7    <u>Notices</u>.  Notify Lender in writing, promptly after Borrower's obtaining knowledge thereof, of the termination or breach of any Material Contract, including any contract with any franchisee; the occurrence of any Default or Event of Default; Borrower's violation (or asserted violation) of any Applicable Law (including the Bankruptcy Code or any Environmental Law); any claim that Borrower may make under any policy of insurance with respect to the Collateral; any pleading filed with the Court seeking relief from the automatic stay or conversion or dismissal of the Chapter 11 Case; any offer or other expression of interest from any Person to purchase any of the Collateral (other than sales of Inventory in the Ordinary Course of Business); and any proposed sale of any of the Collateral (including with such notice copies of drafts of all instruments and agreements applicable to any such sale), which shall specify the identity of the proposed purchaser, the terms of the proposed sale and the expected date of closing, subject to Court approval.  Borrower shall provide, or shall cause its counsel in the Chapter 11 Case to provide, Lender's counsel with copies of all pleadings, motions, reports, applications and other papers filed by Borrower with the Court as well as copies of all billing and expense statements received

from any Professional Person.  Borrower shall include counsel for Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Case.

   9.1.8 <u>Compliance With Laws</u>.  Comply with all Applicable Law, including ERISA, FLSA, OSHA, all Environmental Laws, the Bankruptcy Code and all laws, statutes, regulations and ordinances regarding the collection, payment and deposit of Taxes, and obtain and keep in force any and all Governmental Approvals necessary to the ownership of its Properties or to the conduct of its business, to the extent that any such failure to comply, obtain or keep in force could be reasonably expected to have a Material Adverse Effect.

   9.1.9 <u>Taxes</u>.  Pay and discharge all Taxes prior to the date on which such Taxes become delinquent or penalties attach thereto unless such Taxes are being Properly Contested and unless such Taxes accrued or arose prior to the Petition Date and payment thereof has not been approved by the Court. Borrower shall promptly confirm in writing to Lender, after the end of each month, that Borrower has paid all Sales Taxes collected during the immediately preceding month and the amount of all such payments.

   9.1.10 <u>Professional Expense Reporting</u>.  Cause Professionals retained by it to submit monthly statements for services rendered and expenses incurred and promptly after receipt thereof forward copies of same to Lender, as redacted to protect any attorney-client or work product privilege that may apply.  Borrower shall also forward to Lender copies of any statements received by Borrower from any other Professionals.

   9.1.11 <u>Turn Over of Collateral Proceeds</u>.  Promptly turn over to Lender all proceeds received from any collection, sale or other disposition of any Collateral, except as provided otherwise in any Financing Order.

   **9.2** <u>**Negative Covenants**</u>.  During the DIP Term and thereafter until Full Payment of the Obligations, Borrower covenants that, unless otherwise consented to in writing by Lender, it shall not:

   9.2.1 <u>Loans</u>.  Make any loans or other advances of money (other than for salary, travel advances, advances against commissions and other similar advances in the Ordinary Course of Business) to any Person.

   9.2.2 <u>Limitation on Liens</u>.  Create or suffer to exist any Lien upon any of the Collateral or its other Property, income or profits, whether now owned or hereafter acquired, except:  (i) Liens at any time granted in favor of Lender and other Liens in existence on the Petition Date that were not created or suffered to exist in violation of the Pre-Petition Loan Documents; (ii) post-Petition Date Liens for Taxes (excluding any Lien imposed pursuant to any of the provisions of ERISA) not yet due or being Properly Contested; (iii) post-Petition Date statutory Liens (excluding Liens imposed pursuant to any of the provisions of ERISA) securing the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons for labor, materials, supplies or rentals incurred in the Ordinary Course of Business, but only if the payment thereof is not at the time required or the Debt secured by such Lien is being Properly Contested; (iv) post-Petition Date Liens resulting from deposits made in the Ordinary Course of Business in connection with workmen's compensation, unemployment insurance, social security and other like laws; (v) reservations, exceptions, easements, rights-of-way, and other similar encumbrances affecting Real Estate of Borrower that were in existence on the Petition Date and do not violate any terms of the Pre-Petition Loan Documents; and (vi) such other Liens as Lender may consent to in writing from time to time in its discretion.

9.2.3    <u>Disposition of Assets</u>.  Sell, lease or otherwise dispose of any of the Collateral, including any disposition of the Collateral as part of a sale and leaseback transaction, to or in favor of any Person, except (i) sales of Inventory in the Ordinary Course of Business for so long as no Event of Default exists hereunder, (ii) dispositions of Property that are consented to in writing by Lender and authorized by the Court after notice and hearing, (iii) dispositions in connection with which Full Payment is made of all of the Obligations and Pre-Petition Debt (to the extent not theretofore paid), (iv) the rejection pursuant to Section 365 of the Bankruptcy Code of unexpired leases and executory contracts, and (v) other sales, leases or dispositions that are consented to by Lender.

9.2.4    <u>Payment of Claims</u>.  Make any payment of principal or interest on account of any claim against Borrower that arose prior to the Petition Date, other than claims that may be paid from the proceeds of Loans pursuant to **Section 1.1.2.**

9.2.5    <u>Filing of Motions and Applications</u>.  Apply to the Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders, or (iii) permit any Debt or claim to be *pari passu* with or senior to any of the Obligations.

9.2.6    <u>Modifications to Financing Orders</u>.  Seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders.

9.2.7    <u>Distributions</u>.  Make any Distributions.

9.2.8    <u>Permitted Debt</u>.  Create, incur, assume or suffer to exist any Debt other than the Pre-Petition Debt and claims in existence on the Petition Date to the extent not incurred in violation of the Pre-Petition Loan Documents; the Obligations; and Debt (other than Debt for Money Borrowed) incurred in the Ordinary Course of Business of Borrower during the Chapter 11 Case, including Professional Expenses, so long as such Debts are not past due and payable and are not secured by any Lien.

9.2.9    <u>Conduct of Business</u>.  Engage in any business other than the business engaged in by it on the Petition Date and any business or activities that are substantially similar, related or incidental thereto.

9.2.10    <u>Use of Proceeds</u>.  Use any proceeds of Loans for a purpose that is not expressly permitted by **Section 1.1.2.**

9.2.11    <u>Organization Documents</u>.  Amend, modify or otherwise change any of the terms or provisions in any of its Organization Documents as in effect on the date hereof.

## SECTION 10.  CONDITIONS PRECEDENT

**10.1    Conditions Precedent to Initial Credit Extensions**.  Notwithstanding any other provision of this Agreement or any of the other Loan Documents, and without affecting in any manner the rights or discretion of Lender under other sections of this Agreement, Lender does not intend to fund Loans requested by Borrower during the Interim Period unless each of the following conditions has been and continues thereafter to be satisfied:

10.1.1    All of the Loan Documents shall have been executed in form and substance satisfactory to Lender by each of the signatories thereto and accepted by Lender, and each Obligor shall be in compliance with all of the terms thereof, and all representations and warranties contained therein shall be true and correct in all material respects.

- 14 -

10.1.2   No Default or Event of Default shall exist at the time of, and would not result from the funding of, any requested Loan, and no event shall have occurred and no condition shall exist since the Petition Date that has had or could reasonably be expected to have a Material Adverse Effect.

10.1.3   Lender shall have received and found satisfactory the Interim Budget.

10.1.4   Lender shall have confirmed that there are no liens on or claims to any of the Collateral as of the Petition Date other than the Permitted Liens.

10.1.5   The Interim Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such Order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal).

10.1.6   All of the "first day orders" presented to the Court at or about the time of the commencement of the Chapter 11 Case shall be satisfactory in form and substance to Lender.

10.1.7   There is not pending any motion which, if granted by the Court, would result in an Event of Default.

**10.2**     **Conditions Precedent to All Credit Extensions**.   Notwithstanding any other provision of this Agreement or any of the other Loan Documents, and without affecting in any manner the rights or discretion of Lender under other sections of this Agreement, Lender does not intend to fund any Loans unless and until each of the following conditions has been and continues to be satisfied:

10.2.1   No Default or Event of Default exists at the time, or would result from the funding, of any Loan or other extension of credit.

10.2.2   The Court shall have entered the Final Financing Order not later than March 10, 2010.

10.2.3   Lender shall have reviewed and found satisfactory the Supplemental Budget.

10.2.4   No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed before any court or Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of, any of the Loan Documents or the consummation of any of the transactions contemplated thereby.

10.2.5   No event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect.

10.2.6   With respect to all Loans requested after March 10, 2010, the final hearing on the DIP Motion shall have been held, with the presentation of evidence and the resolution of any objections to the DIP Motion or the proposed Final Financing Order in a manner satisfactory to Lender, and the Final Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of Lender.

**10.3**     **Limited Waiver of Conditions Precedent**.   If Lender shall make any Loan or otherwise extend any credit to Borrower under this Agreement at a time when any of the foregoing conditions precedent are not satisfied (regardless of whether the failure of satisfaction of any of such conditions precedent is known or unknown to Lender), the funding of such Loans shall not operate as a waiver of the

right of Lender to insist upon the satisfaction of all conditions precedent with respect to each subsequent Loan requested by Borrower or a waiver of any Default or Event of Default as a consequence of the failure of any such conditions to be satisfied. Without limiting the generality of the foregoing, if Lender shall make any Loan or otherwise extend any credit to Borrower at a time when any condition set forth in **Section 10** is not satisfied, all Obligations arising from the extension of any such credit shall be payable **on demand**, and Lender shall have no obligation to fund any future request for Loans.

## SECTION 11.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

**11.1**      **Events of Default**.  The occurrence of any one or more of the following events shall constitute an "Event of Default":

11.1.1  <u>Payment of Obligations</u>.  Borrower shall fail to pay (a) the principal of or accrued interest with respect to any Loan on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) or (b) any of the other Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise).

11.1.2  <u>Misrepresentations</u>.  Any warranty, representation, or other statement made or furnished to Lender by or on behalf of Borrower or in any instrument, certificate or financial statement furnished in compliance with or in reference to this Agreement or any of the Loan Documents proves to have been false or misleading in any material respect when made or furnished.

11.1.3  <u>Breach of Specific Covenants</u>. Borrower shall fail or neglect to perform, keep or observe any covenant contained in **Sections 1.1.2, 9.1.12 or 9.2** hereof on the date that Borrower are required to perform, keep or observe such covenant.

11.1.4  <u>Breach of Other Covenants</u>.  Borrower shall fail or neglect to perform, keep or observe any covenant (other than a covenant specifically addressed elsewhere in this **Section 11** and excluding the events referenced in **Section 11.8** hereof) contained in this Agreement and the breach of such other covenant is not cured to Lender's satisfaction within ten (10) days after the date on which such failure or neglect first becomes known to Borrower; <u>provided</u>, <u>however</u>, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 10-day period.

11.1.5  <u>Default Under Other Loan Documents</u>.  Any event of default shall occur under, or Borrower shall default in the performance or observance of any term, covenant, condition or agreement contained in, any of the other Loan Documents and such default shall continue beyond any applicable period of grace.

11.1.6  <u>Cross-Defaults</u>.  There shall occur any default or event of default on the part of Borrower under any agreement, document or instrument, which is entered into after the Petition Date and which relates to any Debt for Money Borrowed if, as a consequence of such default or event of default, the holder of such Debt shall be authorized to accelerate the maturity or demand payment thereof.

11.1.7  <u>Uninsured Losses; Unauthorized Dispositions</u>.  There shall occur any material loss, theft, damage or destruction not fully covered by insurance (as required by this Agreement and subject to such deductibles as Lender shall have agreed to in writing), or any sale, lease or encumbrance of any of the Collateral or the making of any levy, seizure, or attachment thereof or thereon, except as may be specifically permitted by other provisions of this Agreement.

- 16 -

11.1.8  <u>Certain Bankruptcy Events</u>.  A trustee or examiner with expanded powers is appointed in any of the Chapter 11 Case; the dismissal or conversion to Chapter 7 of the Chapter 11 Case; confirmation of any Reorganization Plan in the Chapter 11 Case, other than an Acceptable Plan; amendment or stay of any of the Financing Orders or reversal, modification, or vacation of either of the Financing Orders, whether on appeal or otherwise; the filing of any motion or other request with the Court seeking authority to use any cash proceeds of any of the Collateral without Lender's consent or Borrower's obtaining any financing under Section 364(d) of the Bankruptcy Code with respect to any of the Collateral; the failure of Borrower to file a motion seeking approval to sell all or substantially all of their assets under Section 363 of the Bankruptcy Code on or prior to February 19, 2010; the challenge by Borrower or any Committee of the validity, extent, perfection, or priority of any liens of Lender or Pre-Petition Agent; or any person or entity holding a lien upon any pre-petition or post-petition Property of Borrower being granted relief from the automatic stay if the value of the property that is the subject of such lien is equal to or greater than $10,000.

11.1.9   <u>Failure of Loan Documents</u>.  Any covenant, agreement or obligation of Borrower contained in or evidenced by any of the Loan Documents shall cease to be enforceable or shall be determined to be unenforceable in accordance with its terms; Borrower shall deny or disaffirm its obligations under any of the Loan Documents or Liens granted in connection therewith; or the Liens granted in any of the Collateral shall be determined to be voidable, invalid or subordinated or shall be determined, with respect to any material part of the Collateral, to be unperfected or not to have the priority contemplated by this Agreement.

11.1.10 <u>Change of Control</u>.  Any Person or group of Persons shall acquire for the first time (in one or more transactions) direct or indirect ownership or the power to vote more than 10% of the issued and outstanding capital stock or membership interests of Borrower.

**11.2**   **Acceleration of the Obligations**.  Without in any way limiting the right of Lender to demand payment of any portion of the Obligations payable on demand in accordance with this Agreement, upon or at any time after the occurrence of an Event of Default as above provided, Lender may, in its discretion, (i) declare the principal of and any accrued interest on the Loans and all other Obligations owing under any of the Loan Documents to be, whereupon the same shall become, without further notice or demand (all of which notice and demand Borrower expressly waives), forthwith due and payable and Borrower shall forthwith pay to Lender the entire principal of and accrued and unpaid interest on the Loans and other Obligations plus reasonable attorneys' fees and expenses if such principal and interest are collected by or through an attorney-at-law and (ii) terminate the DIP Facility.

**11.3**   **Remedies**.  Upon or at any time after the occurrence of an Event of Default, but subject at all times to any limitations in the Financing Orders, Lender may, in its discretion, exercise from time to time all rights and remedies available to Lender under the Pre-Petition Loan Documents to enforce collection of any Pre-Petition Debt then outstanding as well as the following rights and remedies to enforce collection of the Obligations:

11.3.1  All of the rights and remedies of a secured party under the UCC or under other Applicable Law, and all other legal and equitable rights to which Lender may be entitled under any of the Loan Documents or the Financing Orders, all of which rights and remedies shall be cumulative and shall be in addition to any other rights and remedies contained in this Agreement or any of the other Loan Documents, and none of which shall be exclusive.

11.3.2  The right to collect Accounts, Chattel Paper, Instruments and General Intangibles and all other rights of Borrower to the payment of money from any Person obligated therefor.

- 17 -

11.3.3   The right to take immediate possession of all tangible items of the Collateral and (i) to require Borrower to assemble such Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender that is reasonably convenient to both parties and (ii) to enter any of the premises of Borrower or wherever any of the Collateral shall be located, and to keep and store the same on said premises until sold (and if said premises be the Property of Borrower, Borrower agrees not to charge Lender for storage thereof).

11.3.4   The right to sell or otherwise dispose of all or any Inventory in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice (if any) as may be required by Applicable Law, in lots or in bulk, for cash or on credit, all as Lender, in its discretion, may deem advisable.  Borrower agrees that 10 days written notice to Borrower of any public or private sale or other disposition of such Collateral shall be reasonable notice thereof, and such sale shall be at such locations as Lender may designate in said notice.  Lender shall have the right to conduct such sales on Borrower's premises, without charge therefor, and such sales may be adjourned from time to time in accordance with Applicable Law.  Lender may sell, lease or otherwise dispose of such Collateral, or any part thereof, for cash, credit or any combination thereof, and Lender may purchase all or any part of such Collateral at public or, if permitted by Applicable Law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations.

11.3.5   The right to exercise all of Lender's rights and remedies with respect to its Liens on any Real Estate.

Lender is hereby irrevocably granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, tradenames, trademarks and advertising matter, or any Property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit.

**11.4**   **Setoff.**  In addition to any Liens granted under any of the Loan Documents and any rights now or hereafter available under Applicable Law, Lender is hereby authorized at any time that an Event of Default exists, without notice to Borrower or any other Person (any such notice being hereby expressly waived) to set off any other Debt at any time held or owing by Lender or any of its Affiliates to or for the credit or the account of Borrower against and on account of the Obligations of Borrower arising under the Loan Documents to Lender, including all Loans and all claims of any nature or description arising out of or in connection with this Agreement, irrespective of whether or not (i) Lender shall have made any demand hereunder, (ii) Lender shall have declared the principal of and interest on the Loans and other amounts due hereunder to be due and payable as permitted by this Agreement and even though such Obligations may be contingent or unmatured or (iii) the Collateral for the Obligations is adequate.

**11.5**   **Remedies Cumulative; No Waiver.**

11.5.1   All covenants, conditions, provisions, warranties, guaranties, indemnities, and other undertakings of Borrower contained in this Agreement and the other Loan Documents, or in any document referred to herein or contained in any agreement supplementary hereto or in any schedule given to Lender or contained in any other agreement between Lender and Borrower, heretofore, concurrently, or hereafter entered into, shall be deemed cumulative to and not in derogation or substitution of any of the terms, covenants, conditions, or agreements of Borrower herein contained.  The rights and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any rights or remedies that Lender would otherwise have.

- 18 -

11.5.2   The failure or delay of Lender to require strict performance by Borrower of any provision of any of the Loan Documents or to exercise or enforce any rights, Liens, powers or remedies under any of the Loan Documents or with respect to any Collateral shall not operate as a waiver of such performance, Liens, rights, powers and remedies, but all such requirements, Liens, rights, powers, and remedies shall continue in full force and effect until all Loans and all other Obligations owing or to become owing from Borrower to Lender shall have been fully satisfied.   None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Loan Documents and no Event of Default by Borrower under this Agreement or any other Loan Documents shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing specifying such suspension or waiver and is signed by a duly authorized representative of Lender and directed to Borrower.

11.5.3   If Lender shall accept performance by Borrower, in whole or in part, of any obligation that Borrower is required by any of the Loan Documents to perform only when a Default or Event of Default exists, or if Lender shall exercise any right or remedy under any of the Loan Documents that may not be exercised other than when a Default or Event of Default exists, Lender's acceptance of such performance by Borrower or Lender's exercise of any such right or remedy shall not operate to waive any such Event of Default or to preclude the exercise by Lender of any other right or remedy, unless otherwise expressly agreed in writing by Lender.

## SECTION 12.  MISCELLANEOUS

**12.1    Power of Attorney.**  Borrower hereby irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) and Lender, or Lender's designee, may, without notice to Borrower and in either Borrower's or Lender's name, but at the cost and expense of Borrower:

12.1.1   At such time or times as Lender or said designee, in its discretion, may determine, endorse Borrower's name on any payment item or proceeds of the Collateral which come into the possession of Lender or under Lender's control.

12.1.2   At any time that an Event of Default exists: (i) demand payment of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise, and generally exercise all of Borrower's rights and remedies with respect to the collection of the Accounts; (ii) settle, adjust, compromise, discharge or release any of the Accounts or other Collateral or any legal proceedings brought to collect any of the Accounts or other Collateral; (iii) sell or assign any of the Accounts and other Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable; (iv) take control, in any manner, of any item of payment or proceeds relating to any Collateral; (v) prepare, file and sign Borrower's name to a proof of claim in bankruptcy or similar document against any Account Debtor or to any notice of lien, assignment or satisfaction of Lien or similar document in connection with any of the Collateral; (vi) receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for delivery thereof to such address as Lender may designate; (vii) endorse the name of Borrower upon any of the items of payment or proceeds relating to any Collateral and deposit the same to the account of Lender on account of the Obligations; (viii) endorse the name of Borrower upon any Chattel Paper, Document, Instrument, invoice, freight bill, or similar document or agreement relating to any Accounts or Inventory of any Obligor and any other Collateral; (ix) use Borrower's stationery and sign the name of Borrower to verifications of the Accounts and notices thereof to Account Debtors; (x) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts, Inventory and any other Collateral; (xi) make and adjust claims under policies of insurance; and (xii) do all other acts and things necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement.

**12.2**     **General Indemnity.**  Borrower hereby agrees to indemnify and defend the Indemnitees and to hold the Indemnitees harmless from and against any Claim ever suffered or incurred by any of the Indemnitees arising out of or related to this Agreement or any of the other Loan Documents, the performance by Lender of its duties or the exercise of any of its rights or remedies hereunder, or the result of Borrower's failure to observe, perform or discharge any of Borrower's duties hereunder.  Borrower shall also indemnify and defend the Indemnitees against and save the Indemnitees harmless from all Claims of any Person arising out of, related to, or with respect to any transactions entered into pursuant to this Agreement or Lender's Lien upon the Collateral.  Without limiting the generality of the foregoing, these indemnities shall extend to any Claims asserted against any of the Indemnitees by any Person under any Environmental Laws or similar laws by reason of Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials or other toxic substances.  Additionally, if any Taxes (excluding Taxes imposed upon or measured solely by the net income of Lender, but including, any intangibles tax, stamp tax, recording tax or franchise tax) shall be payable by Lender or any Obligor on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the other Loan Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrower shall pay (or will promptly reimburse Lender for the payment of) all such Taxes, including any interest and penalties thereon, and will indemnify and hold Indemnitees harmless from and against liability in connection therewith.  The foregoing indemnities shall not apply to protect any of the  Indemnitees for the consequences of their own gross negligence or willful misconduct.

**12.3**     **Survival of All Indemnities.**  Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, the obligations of Borrower with respect to each indemnity given by it in this Agreement shall survive the Full Payment of the Obligations and the termination of the DIP Facility.

**12.4**     **Indulgences Not Waivers.**  Lender's failure at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith.

**12.5**     **Modification of Agreement**.  This Agreement may not be modified, altered or amended, except by an agreement in writing signed by Borrower and Lender.

**12.6**     **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**12.7**     **Cumulative Effect; Conflict of Terms**.  To the fullest extent permitted by Applicable Law, the provisions of the Other Agreements and the Security Documents are hereby made cumulative with the provisions of this Agreement.  Except as otherwise provided in any of the other Loan Documents by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in direct conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

**12.8**     **Execution in Counterparts; Electronic Signatures**.  This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  Signed counterparts of this Agreement may be transmitted and received by facsimile transmission or electronic

mail, and any copy of a signed counterpart that has been delivered by electronic means shall be considered to be an original counterpart for all purposes.

      **12.9**    **Lender's Consent**.  Whenever Lender's consent is required to be obtained under this Agreement or any of the other Loan Documents as a condition to any action, inaction, condition or event, Lender shall be authorized to give or withhold its consent in its discretion and to condition its consent upon the giving of additional collateral security for the Obligations, the payment of money or any other matter.

      **12.10**    **Notices**.  All notices, requests and demands to or upon a party hereto shall be in writing and shall be sent by certified or registered mail, return receipt requested, personal delivery against receipt or by telecopier or other facsimile transmission and shall be deemed to have been validly served, given or delivered when delivered against receipt or 3 Business Days after deposit in the U.S. mail, certified mail postage prepaid, or, in the case of facsimile transmission, when received (if on a Business Day and, if not received on a Business Day, then on the next Business Day after receipt) at the office where the noticed party's telecopier is located, in each case addressed to the noticed party at the address shown for such party on the signature page hereof and to any counsel for such party who has made an appearance in the Chapter 11 Case at the address for notices to such counsel in the Chapter 11 Case.

      **12.11**    **Time of Essence**.  Time is of the essence of this Agreement, the Other Agreements and the Security Documents.

      **12.12**    **Entire Agreement**.  This Agreement, Appendix A to this Agreement and the other Loan Documents, together with all other instruments, agreements and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.

      **12.13**    **Interpretation**.  No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having, or being deemed to have, structured, drafted or dictated such provision.

      **12.14**    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

      **12.15**    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns, except that (i) Borrower shall not have the right to assign its rights or delegate performance of any of its obligations under any of the Loan Documents, and (ii) neither this Agreement nor any of the other Loan Documents shall inure to the benefit of any trustee appointed in the Chapter 11 Case or any Chapter 7 case of Borrower without Lender's express written consent.

      **12.16**    **Waivers by Borrower**.  To the fullest extent permitted by Applicable Law, Borrower waives (a) the right to trial by jury in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies anything Lender may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Lender to exercise any rights or remedies; (e) the benefit of all

valuation, appraisement and exemption laws; (f) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any of the Obligations, the Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.  Borrower acknowledges that the foregoing waivers are a material inducement to Lender entering into this Agreement and that Lender is relying upon the foregoing in its dealings with Borrower.  Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

[Signatures commence on following page.]

**IN  WITNESS  WHEREOF,** this Agreement has been duly executed on the day and year specified at the beginning of this Agreement.

**BORROWER:**

**MC PRECAST, INC.**

By: _____
           Name: _____
           Title: _____

Notice Address for Borrower:

1005 Virginia Avenue
Suite 100
Atlanta, Georgia 30354
Attn:  Mr. Mahlon C. Rhaney, Jr., President
Telecopy No.  (404) 766-1001

[Signatures continued on following page.]

Accepted as of February 10, 2010.

**LENDER:**

**ATLANTIC CAPITAL BANK**

By: _____

       Name: _____

       Title: _____

Notice Address for Lender:

Atlantic Capital Bank
3280 Peachtree Road NE
Terminus 100, 16th Floor, Suite 1600
Atlanta, Georgia  30305
Attn:  Mr. Robert Bugbee
Telecopy No.  (404) 995-6070

# APPENDIX A

## GENERAL DEFINITIONS

When used in the Post-Petition Loan and Security Agreement dated February 10, 2010, between **MC PRECAST, INC.,** a Georgia corporation ("Borrower"), and **ATLANTIC CAPITAL BANK,** a Georgia bank ("Lender"), the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and *vice versa*):

Acceptable Plan - a Reorganization Plan which provides for allowance of all claims in favor of Lender as fully secured claims; Full Payment of all Obligations and any outstanding Pre-Petition Debt on the effective date of such Reorganization Plan; an effective date no later than 45 days after the date of entry of the Confirmation Order with respect to such Reorganization Plan; and a full and complete release of any and all claims that Borrower or the Estate might have or assert against Lender (whether arising prior to or after the Petition Date), including all claims that arise under any provision in Chapter 5 of the Bankruptcy Code; or which is otherwise acceptable to Lender in its discretion.

Account - shall have the meaning ascribed to the term "account" in the UCC and shall include a right to payment for goods sold or leased or for services rendered that is not evidenced by an Instrument or Chattel Paper, whether or not any such right to payment has been earned by performance.

Account Debtor - any Person who is or may become obligated under or on account of an Account.

Adequate Protection Claim - the right of the holder of a secured claim against Borrower to receive periodic payments as adequate protection under Sections 361 or 363 of the Bankruptcy Code.

Affiliate - a Person (other than a subsidiary):  (i) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, another Person; (ii) which beneficially owns or holds 10% or more of any class of the Equity Interests of another Person; or (iii) 10% or more of the Equity Interests of which is beneficially owned or held by another Person or a subsidiary of another Person.

Agreement - the Post-Petition Loan and Security Agreement referred to in the first sentence of this Appendix A and all Exhibits thereto and this Appendix A.

Applicable Law - all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Documents in question, including all applicable common law and equitable principles; all provisions of all applicable state and federal constitutions, statutes, rules, regulations and orders of governmental bodies; and orders, judgments and decrees of all courts and arbitrators.

Avoidance Claim - any claim that could be asserted by or on behalf of Borrower or the Estate against a Person under 11 U.S.C.  §§ 544, 546, 547, 548, 549, or 550.

Bankruptcy Code - title 11 of the United States Code.

Business Day - any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Georgia or the State of Georgia or is a day on which banking institutions located in either of such states are closed.

Capitalized Lease Obligation - any Debt represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Cash Collateral - cash or Cash Equivalents, and any interest earned thereon, that is deposited with Lender as security for the Obligations to the extent provided in the Agreement.

Cash Equivalents - (i) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government having maturities of not more than 12 months from the date of acquisition; (ii) domestic certificates of deposit and time deposits having maturities of not more than 12 months from the date of acquisition, bankers' acceptances having maturities of not more than 12 months from the date of acquisition and overnight bank deposits, in each case issued by any commercial bank organized under the laws of the United States, any state thereof or the District of Columbia, which at the time of acquisition are rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and (unless issued by Lender) not subject to offset rights in favor of such bank arising from any banking relationship with such bank; (iii) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (i) and (ii) entered into with any financial institution meeting the qualifications specified in clause (ii) above; and (iv) commercial paper having at the time of investment therein or a contractual commitment to invest therein a rating of A-1 (or better) by S&P or P-1 (or better) by Moody's, and having a maturity within 9 months after the date of acquisition thereof.

CERCLA - the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 et seq. and its implementing regulations.

Chapter 11 Case - as defined in the Recitals to the Agreement.

Chattel Paper - shall have the meaning ascribed to the term "chattel paper" in the UCC.

Claims - any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, awards, remedial response costs, expenses or disbursements of any kind or nature whatsoever (including reasonable attorneys', accountants', consultants' or paralegals' fees and expenses), whether arising under or in connection with the Loan Documents, any Applicable Law (including any Environmental Laws) or otherwise, that may be suffered or incurred by Lender prior to, on or after the Petition Date and whether suffered or incurred in or as a result of any investigation, litigation, arbitration or other judicial or non-judicial proceeding or any appeals related thereto.

Closing Date - the date on which all of the conditions precedent in **Section 10.1** of the Agreement are satisfied and the initial Loans are made under the Agreement.

Collateral - all of the Property and interests in Property of Borrower that are described in **Section 6** of the Agreement, and all other Property and interests in Property that now or hereafter secure the payment and performance of any of the Obligations, whether or not such Property or interest in Property was in existence on or acquired by Borrower after the Petition Date.

Commercial Tort Claim - shall have the meaning ascribed to the term "commercial tort claim" in the UCC.

Committee - a creditors' or equity security holders' committee appointed in the Chapter 11 Case by the U.S. Trustee.

Confirmation Order - an order entered by the Court confirming a Reorganization Plan.

Contingent Obligation - with respect to any Person, any obligation of such Person arising from any guaranty, indemnity, or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including (i) the direct or indirect guaranty endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligations or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the Ordinary Course of Business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

Debt - as applied to a Person means, without duplication:  (i) all items which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person on the date as of which Debt is to be determined, including Capitalized Lease Obligations; (ii) all obligations of other Persons which such Person has guaranteed; (iii) all reimbursement obligations in connection with letters of credit or letter of credit guaranties issued for the account of such Person; and (iv) in the case of Borrower (without duplication), the Pre-Petition Debt and the Obligations.

Default - an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

Deposit Account - a demand, time, savings, passbook, money market or other depository account, or a certificate of deposit, maintained by Borrower with any bank, savings and loan association, credit union or other depository institution.

DIP Facility - the $500,000 discretionary credit facility established by Lender in favor of Borrower under **Section 1** of the Agreement.

-3-

DIP Motion - the Motion of Borrower for approval of the financing under the DIP Facility pursuant to the Agreement.

DIP Term - the period beginning on the date of entry of the Interim Order and ending on the Maturity Date.

Distribution - in respect of any entity, (i) any payment of any dividends or other distributions on Equity Interests of the entity (except distributions in such Equity Interests) and (ii) any purchase, redemption or other acquisition or retirement for value of any Equity Interests of the entity or any Affiliate of the entity unless made contemporaneously from the net proceeds of the sale of Equity Interests.

Document - shall have the meaning ascribed to the term "document" in the UCC.

Dollars and the sign $ - lawful money of the United States of America.

Environmental Laws - all federal, state and local laws, rules, regulations, ordinances, programs, permits, guidance documents promulgated by regulatory agencies, orders and consent decrees relating to human health and safety or the protection or pollution of the environment, including CERCLA.

Equipment - shall have the meaning ascribed to the term "equipment" in the UCC.

Equity Interest - the interest of a shareholder in a corporation, a partner (whether general or limited) in a partnership (whether general, limited or limited liability), a member in a limited liability company, or any other Person having any other form of equity security.

ERISA - the Employee Retirement Income Security Act of 1974 and all rules and regulations from time to time promulgated thereunder.

Estate - the estate created in the Chapter 11 Case pursuant to 11 U.S.C. § 541(a).

Event of Default - as defined in **Section 11** of the Agreement.

Extraordinary Expenses - all costs, expenses, fees (including fees incurred to Lender Professionals) or advances that Lender may suffer or incur, whether prior to or after the occurrence of an Event of Default, on account of or in connection with (i) the audit, inspection, repossession, storage, repair, appraisal, insuring, completion of the manufacture of, preparing for sale, advertising for sale, selling, collecting or otherwise preserving or realizing upon any Collateral; (ii) the defense of Lender's Lien upon any Collateral or the priority thereof or any adverse claim with respect to the Loans, the Loan Documents or the Collateral asserted by any Obligor, any receiver or trustee for any Obligor or any creditor or representative of creditors of any Obligor; (iii) the settlement or satisfaction of any Liens upon any Collateral (whether or not such Liens are Permitted Liens); (iv) the collection or enforcement of any of the Obligations; (v) the negotiation, documentation, and closing of any restructuring or forbearance agreement with respect to the Loan Documents or Obligations; (vi) amounts advanced by Lender pursuant to **Section 7.1.2** of the Agreement; (vii) the enforcement of any of the provisions of any of the Loan Documents; (viii) any payment under indemnity or other payment agreement provided by Lender to any other financial institution in connection with any dominion account or any lockbox arrangement; or (ix) the monitoring of or participation in hearings during the Chapter 11 Case. Such costs, expenses and advances may include transfer fees, taxes, storage fees, insurance costs,

permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, consultants' fees, accountants' fees, environmental study fees, wages and salaries paid to employees of Borrower or independent contractors in liquidating any Collateral, travel expenses, all other fees and expenses payable or reimbursable by Borrower or any other Obligor under any of the Loan Documents, and all other fees and expenses associated with the enforcement of rights or remedies under any of the Loan Documents, but excluding compensation paid to employees (including inside legal counsel who are employees) of Lender.

Final Financing Order - an order which is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), is in form and substance acceptable to Lender in all respects, authorizes the incurrence by Borrower of post-petition secured, priming and superpriority Debt under the DIP Facility in accordance with the Loan Documents, and affords adequate protection of the Liens in favor of Lender under the Pre-Petition Loan Documents.

Financing Orders - the Interim Financing Order and the Final Financing Order.

FLSA - the Fair Labor Standards Act of 1938.

Full Payment - with respect to any Pre-Petition Debt or Obligations, (a) the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing during the Chapter 11 Case or any other Insolvency Proceeding (whether or not allowed); (b) if any of such Pre-Petition Debt or Obligations is inchoate or contingent in nature, including Contingent Obligations, the delivery to Lender of Cash Collateral in an amount equal to Lender's good faith estimate of all amounts due or to become due in respect of such Contingent Obligations; (c) the absence on the payment date of any pending or threatened Claim against Lender for or on account of any act, omission or transaction after the Petition Date; and (d) the receipt by Lender of a release of any claims of Obligors against Lender arising during the pendency of the Chapter 11 Case.  The Obligations shall not be deemed to have been paid in full until the DIP Facility has expired or been terminated.

GAAP - generally accepted accounting principles in the United States of America in effect from time to time.

General Intangible - shall have the meaning ascribed to the term "general intangible" in the UCC and shall include all interests in Intellectual Property.

Governmental Approvals - all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all Governmental Authorities.

Governmental Authority - any federal, state, municipal, national or other governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the District of Columbia or a foreign entity or government.

Guarantor Reaffirmation Documents - a written reaffirmation and amendment agreement executed by each Guarantor and Borrower, in form and substance acceptable to Atlantic Capital Bank, by which each Guarantor agrees, among other things, to guaranty the payment and

performance of the DIP Facility and that each guaranty, security agreement, blocked account agreement and related agreement executed by such Guarantor prior to the Petition Date shall apply to the Obligations in addition to the Pre-Petition Debt.

Guarantors - Mahlon C. Rhaney, Jr., and Kathleen J.A. Rhaney.

Indemnitees - Lender; all of Lender's present and future officers, directors and agents; and all of the Lender Professionals.

Insolvency Proceeding - any action, case or proceeding commenced by or against a Person, or any agreement of such Person, for (a) the entry of an order for relief under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), (b) the appointment of a receiver, trustee, liquidator or other custodian for such Person or any part of its Property, (c) an assignment or trust mortgage for the benefit of creditors of such Person, or (d) the liquidation, dissolution or winding up of the affairs of such Person.

Instrument - shall have the meaning ascribed to the term "instrument" in the UCC.

Intellectual Property - Property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, tradename, mask work, trade secret or license or other right to use any of the foregoing.

Intellectual Property Claim - the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property is violative of any ownership of or right to use any Intellectual Property of such Person.

Interim Budget - a cash flow forecast, in form and substance acceptable to Lender, projecting, among other things, Borrower's cash receipts and disbursements (including costs of the Chapter 11 Case) on a weekly basis for the 15-day period beginning on the Petition Date, a copy of which is attached hereto as **Exhibit A** (as at any time amended with the consent of Lender).

Interim Financing Order - an order that is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes Borrower to incur, during the Interim Period, post-petition secured, priming and superpriority Debt under the DIP Facility in accordance with the Loan Documents and affords adequate protection of the Liens in favor of Lender under the Pre-Petition Loan Documents and which is in form and substance satisfactory in all respects to Lender.

Interim Period - the period commencing upon entry of the Interim Financing Order and ending on the entry of the Final Financing Order.

Inventory - shall have the meaning ascribed to the term "inventory" in the UCC and shall include, in the case of Borrower, all goods intended for sale or lease by Borrower, or for display or demonstration; all work in process; all raw materials and other materials and supplies of every nature and description used or which might be used in connection with the manufacture, printing, packing, shipping, advertising, selling, leasing or furnishing of such goods or otherwise used or consumed in Borrower's business; and all Documents evidencing and General Intangibles relating to any of the foregoing, whether now owned or hereafter acquired by Borrower.

Investment Property - shall have the meaning ascribed to the term "investment property" in the UCC.

Lender - Atlantic Capital Bank, a Georgia bank.

Lender Professionals - attorneys, accountants, appraisers, business valuation experts, environmental engineers or consultants, turnaround consultants and other professionals or experts retained by Lender.

Letter-of-Credit Right - shall have the meaning ascribed to the term "letter-of-credit right" in the UCC.

License Agreement - any agreement between Borrower and a Licensor pursuant to which Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of Borrower.

Licensor - any Person from whom Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with Borrower's manufacture, marketing, sale or other distribution of any Inventory.

Lien - any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on common law, statute or contract.  The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting Property.  For the purpose of the Agreement, Borrower shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

Loan - a loan made by Lender as provided in **Section 1.1** of the Agreement.

Loan Documents - the Agreement, the Other Agreements, the Guarantor Reaffirmation Documents and the Security Documents and any and all other agreements, instruments and documents now or hereafter executed by Borrower or Guarantors in favor of Lender with respect to any of the transactions contemplated by the Agreement.

Material Adverse Effect - the effect of any event, condition, act, omission or circumstance,  which, alone or when taken together with other events, conditions, acts, omissions or circumstances occurring or existing concurrently therewith, (i) has a material adverse effect upon the business, operations, Properties or condition (financial or otherwise) of any Obligor; (ii) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of the Agreement or any of the other Loan Documents; (iii) has any material adverse effect upon the value of the whole or any material part of the Collateral, the Liens of Lender with respect to the Collateral or the priority of any such Liens; (iv) materially impairs the ability of any Obligor to perform its obligations under the Agreement or any of the other Loan Documents, including repayment of any of the Obligations when due; or (v) materially impairs the ability of Lender to enforce or collect the Obligations or realize upon any of the Collateral in accordance with the Loan Documents and Applicable Law.

Material Contract - any agreement between Borrower and one or more other Persons, the termination of which could reasonably be expected to have a Material Adverse Effect.

<u>Maturity Date</u> - April 15, 2010.

<u>Maximum Facility Amount</u> - an aggregate principal amount outstanding equal to $500,000, excluding all interest, fees and Extraordinary Expenses.

<u>Maximum Rate</u> - the maximum non-usurious rate of interest permitted by Applicable Law that at any time, or from time to time, may be contracted for, taken, reserved, charged or received on the Debt in question or, to the extent that at any time Applicable Law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate. Notwithstanding any other provision hereof, the Maximum Rate shall be calculated on a daily basis (computed on the actual number of days elapsed over a year of 365 or 366 days, as the case may be).

<u>Money Borrowed</u> - as applied to any Person, (i) Debt arising from the lending of money by any other Person to such Person; (ii) Debt, whether or not in any such case arising from the lending of money by another Person to such Person, (A) which is represented by notes payable or drafts accepted that evidence extensions of credit, (B) which constitutes obligations evidenced by bonds, debentures, notes or similar instruments, or (C) upon which interest charges are customarily paid (other than accounts payable) or that was issued or assumed as full or partial payment for Property; (iii) reimbursement obligations with respect to letters of credit or guaranties of letters of credit and (iv) Debt of such Person under any guaranty of obligations that would constitute Debt for Money Borrowed under clauses (i) through (iii) hereof, if owed directly by such Person.

<u>Mortgage</u> - a mortgage, deed of trust or deed to secure debt, as applicable, to be executed by Borrower at Lender's request and by which Borrower shall grant and convey Liens in favor of Lender with respect to the Real Estate as security for the payment and performance of the Obligations.

<u>Newnan Plant</u> - all real property, fixtures, improvements and related personal property more particularly described in (i) the Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of Lender, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 108-134, Records of Coweta County, Georgia, and (ii) the Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of Lender, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 152-178, Records of Coweta County, Georgia.

<u>Notes</u> - any promissory note executed by Borrower at Lender's request to evidence any of the Obligations.

<u>Obligations</u> - all (a) principal of and premium, if any, on the Loans, (b) interest, expenses, fees, charges and all other sums payable by Obligors under any of the Loan Documents, (c) obligations of any Obligor to Lender under any indemnity for Claims in any Loan Document, (d) Extraordinary Expenses, and (g) other Debts, obligations and liabilities of any kind owing by any Obligor to Lender under or pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in the Chapter 11 Case or any other Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

Obligor - Borrower, Guarantors and any other Person that is at any time liable for the payment of the whole or any part of the Obligations or that has granted in favor of Lender a Lien upon any of any of such Person's assets to secure payment of any of the Obligations.

Ordinary Course of Business - the ordinary course of Borrower's business, as conducted by Borrower in accordance with past practices and undertaken by Borrower in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

Organization Documents - with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, operating agreement, members agreement, partnership agreement, voting trust, or similar agreement or instrument governing the formation or operation of such Person.

OSHA - the Occupational Safety and Hazard Act of 1970.

Other Agreements - each Note and any and all agreements, instruments and documents (other than the Agreement and the Security Documents), heretofore, now or hereafter executed by Borrower, any Obligor or any other Person and delivered to Lender in respect of the transactions contemplated by the Agreement.

Permitted Liens - any Lien of a kind specified in **Section 9.2.2** of the Agreement.

Permitted Senior Lien - a Lien upon any of the Collateral which was a Permitted Lien under (and as defined in) the Pre-Petition Loan Agreement and was permitted thereunder to have priority over the Liens of Lender or constitutes a Lien for property taxes that are not yet due and payable (unless and to the extent being Properly Contested).

Person - an individual, partnership, corporation, limited liability company, limited liability partnership, joint stock company, land trust, business trust, or unincorporated organization, or a Governmental Authority.

Petition Date - February 8, 2010.

Plan - an employee benefit plan now or hereafter maintained for employees of Borrower that is covered by Title IV of ERISA.

Pre-Petition Debt - all Debts and other obligations of Borrower to Lender or any other Person on the Petition Date and that arise under any of the Pre-Petition Loan Documents, whether direct or indirect, absolute or contingent or due or to become due, including all pre-petition loans and interest thereon accruing before or after the Petition Date and all legal fees and collection expenses heretofore or hereafter incurred in collecting any of such indebtedness.

Pre-Petition Loan Documents - collectively, each of the following documents, as the same may from time to time have been amended, restated, supplemented or modified: (a) (i) that certain Loan Agreement dated March 5, 2008, between Borrower and Lender, (ii) that certain Business Loan Agreement dated April 30, 2008, by Borrower and Mahlon C. Rhaney, Jr. in favor of Lender, (iii) that certain Loan Agreement dated September 19, 2008, among Borrower, Lender and Mahlon C. Rhaney, Jr., and (iv) that certain Loan Agreement dated March 20, 2009, among Borrower, One Georgia Bank, and Lender in its capacity as a lender and in its capacity as agent for itself and One Georgia Bank, together with (b) each Pre-Petition Security Agreement, and (c) all promissory notes, instruments, agreements, pledges, assignments and other documents

executed in connection therewith or with reference thereto or to evidence or secure payment of the whole or any part of the Pre-Petition Debt, including, without limitation, all "Loan Documents" (as defined in the Loan Agreement dated March 5, 2008, described in clause (a)(i) above).

Pre-Petition Security Agreements - collectively, each of the following documents, as the same may from time to time have been amended, restated, supplemented or modified: (i) that certain Security Agreement dated January 4, 2008, between Borrower and Lender, (ii) that certain Security Agreement dated as of March 5, 2008, between Borrower and Lender, (iii) that certain Security Agreement dated April 30, 2008, between Borrower and Lender, (iv) that certain Security Agreement dated as of September 19, 2008, between Borrower and Lender, (v) that certain Commercial Security Agreement dated February 25, 2009, by Borrower in favor of Lender, (vi) that certain Security Agreement dated as of March 20, 2009, between Borrower and Lender, in its capacity as agent for itself and One Georgia Bank, (vii) that certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of Lender, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 108-134, Records of Coweta County, Georgia, (viii) that certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009, made by Borrower in favor of Lender, in its capacity as agent for itself and One Georgia Bank, and recorded at Deed Book 3440, Page 152-178, Records of Coweta County, Georgia, and (ix) that certain Security Agreement dated as of May 27, 2009, among Borrower, Mahlon C. Rhaney, Jr., Kathleen J. Rhaney, in favor of Lender.

Professional Expenses - the fees and reimbursable expenses of a Professional Person.

Professional Person - a Person who is an attorney, accountant, appraiser, auctioneer or other professional person and who is retained, with Court approval, by (i) Borrower pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

Properly Contested - in the case of any Debt of an Obligor (including any Taxes) that is not paid as and when due or payable by reason of such Obligor's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Debt is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Obligor has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Debt will not have a Material Adverse Effect and will not result in a forfeiture of any assets of such Obligor; (iv) no Lien is imposed upon any of such Obligor's assets with respect to such Debt unless such Lien is at all times junior and subordinate in priority to the Liens in favor of Lender (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the Debt results from, or is determined by the entry, rendition or issuance against an Obligor or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Obligor, such Obligor forthwith pays such Debt and all penalties, interest and other amounts due in connection therewith.

Property - any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

Real Estate - all right, title and interest (including any interest of Borrower as owner, lessor or lessee) at any time or times held by Borrower in any real Property or improvements thereto.

Reorganization Plan - a plan of reorganization filed in the Chapter 11 Case under Section 1121 of the Bankruptcy Code.

S&P - Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

Sales Taxes - Taxes that are required to be collected by Borrower in connection with any sale of Inventory and remitted to a Governmental Authority.

Security Documents - any and all other instruments and agreements now or at any time hereafter securing the whole or any part of the Obligations.

Supplemental Budget - a cash flow forecast, in form and substance acceptable to Lender, projecting, among other things, Borrower's cash receipts and disbursements (including costs of the Chapter 11 Case) on a weekly basis for the 90-day period beginning on the Petition Date (as at any time amended with the consent of Lender).

Supporting Obligation - shall have the meaning ascribed to the term "supporting obligation" in the UCC.

Taxes - any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of whatever nature, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security and franchise taxes now or hereafter imposed or levied by the United States, or any state, local or foreign government or by any department, agency or other political subdivision or taxing authority thereof or therein and all interest, penalties, additions to tax and similar liabilities with respect thereto, but excluding, in the case of Lender, taxes imposed on or measured by the net income or overall gross receipts of Lender.

Termination Date - the date that is the soonest to occur of: (i) the last day of the DIP Term, (ii) the effective date of any Acceptable Plan or the date of entry of a Confirmation Order with respect to any other Reorganization Plan, (iii) the effective date of any sale of all or a substantial part of the Collateral, (iv) the effective date of Lender's termination of the DIP Facility pursuant to **Section 5.2** of the Agreement, (v) the effective date of Borrower's termination of the DIP Facility pursuant to **Section 5.2** of the Agreement, (vi) the date on which Lender is granted relief from the automatic stay, (vii) the date of the closing of a sale of all or substantially all of the assets of Borrower pursuant to 11 U.S.C. § 363, or (viii) the date on which the Chapter 11 Case is dismissed or converted.

U.S. Trustee Fees - fees payable in the Chapter 11 Case to the Office of the United States Trustee.

UCC - the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Georgia from time to time or, when the laws of any other state govern the method or manner of the creation or perfection of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

**Accounting Terms**.  Unless otherwise specified herein, all terms of an accounting character used in the Agreement shall be interpreted, all accounting determinations under the Agreement shall be made, and all financial statements required to be delivered under the Agreement shall be prepared in accordance with GAAP, applied on a basis consistent with the most recent audited consolidated financial statement of Borrower and its subsidiaries heretofore delivered to Lender and using the same method for inventory valuation as used in such audited financial statements, except for any change in which Borrower's independent public accountants concur or as required by GAAP unless (i) Borrower shall have objected to determining such compliance on such basis at the time of delivery of such financial statements or (ii) Lender shall so object in writing within 30 days after the delivery of such financial statements, in either of which events such calculations shall be made on a basis consistent with those used in the preparation of the latest financial statements as to which such objection shall not have been made. In the event of any change in GAAP that occurs after the date of the Agreement and that is material to Borrower, Lender shall have the right to require either that conforming adjustments be made to any financial covenants set forth in the Agreement, or the components thereof, that are affected by such change or that Borrower reports its financial condition based on GAAP as in effect immediately prior to the occurrence of such change.

**Other Terms**.  All other terms contained in the Agreement shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.

**Certain Matters of Construction**.  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."  The section titles, table of contents and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of the Agreement.  All references to statutes (including the UCC) and related regulations shall include any amendments of same after the date hereof and any successor statutes  and regulations; to any of the Loan Documents shall include any and all amendments or modifications thereto and any and all restatements, extensions or renewals thereof; to any Person shall mean and include the successors, heirs and permitted assigns of such Person; to "including" and "include" shall be understood to mean "including, without limitation" and "include, without limitation;"  to the time of day shall mean the time of day on the day in question in Atlanta, Georgia; to any Property of Borrower shall mean and include all Property of the Estate; and to Lender's "discretion" shall mean Lender's sole and absolute discretion.  A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender.

[Signatures commence on following page.]

-12-

IN WITNESS WHEREOF, this Appendix has been duly executed in Atlanta, Georgia, on February 10, 2010.

**BORROWER:**

**MC PRECAST, INC.**

By: _____

     Name: _____

     Title: _____

Accepted as of February 10, 2010.

**LENDER:**

**ATLANTIC CAPITAL BANK**

By: _____

     Name: _____

     Title: _____

## **EXHIBIT A**

## **BUDGET**

**EXHIBIT "C"**

MC Precast
DIP Estimated Funding Budget
Week Ending 2/12/10 - 2/19/10

|  |  | 2/12/2010 | 2/19/2010 | TOTAL |
|---|---|---|---|---|
| **Non-Project Related Expenses** |  |  |  |  |
| Payroll | Gross + Employer Taxes - 6346.50 | 69,546.50 | 23,000.00 | 92,546.50 |
| Health, Vision, Dental Insurance |  |  |  | - |
| Workers Comp Insurance |  | 12,700.00 |  | 12,700.00 |
| Liability Insurance |  | 15,500.00 |  | 15,500.00 |
| Utilities | Electric-Newnan Office | 2,800.00 |  | 2,800.00 |
|  | Mobile phones | 2,600.00 |  | 2,600.00 |
|  | W/S Newnan | 200.00 |  | 200.00 |
|  | Land Phones | 2,300.00 |  | 2,300.00 |
| Rent | Virginia Ave | 1,700.00 |  | 1,700.00 |
| Retainer for filing | Legal - Scroggins & Williamson | 50,000.00 |  | 50,000.00 |
| Retainer for filing | Court Financial Prep - Hays Financial Consult. | 20,000.00 | 5,000.00 | 25,000.00 |
| Employee Expenses |  | 7,900.00 | 3,000.00 | 10,900.00 |
|  |  |  |  |  |
| Total Non-Project Expenses |  | 185,246.50 | 31,000.00 | 216,246.50 |
| **Project Related Expenses** | From Project Completion Schedule |  |  |  |
| Spancrete |  |  |  |  |
|  | CCWA (Coweta Cnty Water Authority) |  |  | - |
|  | BARTOW COUNTY JAIL |  |  | - |
|  | DOUGLAS 911 |  |  | - |
|  | ECUA LAB |  |  | - |
|  | PLEASANT GROVE |  | 3,000.00 | 3,000.00 |
|  | Start up Costs materials & plant repair |  |  | - |
| Construction Ongoing |  |  |  | - |
|  | Komatsu Equipment | 7,500.00 |  | 7,500.00 |
|  | COD Vendor Payments |  | 10,000.00 | 10,000.00 |
|  | Robinson Columbus Sound Walls | 5,000.00 | 2,000.00 | 7,000.00 |
|  | Sunbelt Augusta St. Sebastian RE Walls | 3,000.00 | 1,000.00 | 4,000.00 |
|  | Matthews Atlanta Airport RE Walls & Beams | 2,000.00 | 3,000.00 | 5,000.00 |
|  | Reed Huntsville Mem Pkway  RE Walls | 2,500.00 | 2,500.00 | 5,000.00 |
|  |  |  |  | - |
| Total Project Related Expenses |  | 20,000.00 | 21,500.00 | 41,500.00 |
|  |  |  |  | - |
| **Total Weekly Cash Needs** |  | 205,246.50 | 52,500.00 | 257,746.50 |
|  |  |  |  | - |
| **Anticipated Net Receivables** |  |  | 46,000.00 | 46,000.00 |
|  |  |  |  | - |
| **Anticipated Need for Week** |  | 205,246.50 | 6,500.00 | 211,746.50 |

|  |  |
|---|---|
| Source of A/R | CWM - Airport |