**IT IS ORDERED as set forth below:**

**Date: February 12, 2010**

_____
**W. H. Drake**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| **MC PRECAST, INC.,** | ) | CASE NO. 10-10466-WHD |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**INTERIM ORDER (1) AUTHORIZING DEBTOR-IN-POSSESSION TO OBTAIN
FINANCING, GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS
PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (2) AUTHORIZING DEBTOR
TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363;
(3) GIVING NOTICE OF FINAL HEARING PURSUANT TO
BANKRUPTCY RULE 4001(b)(2) AND (c)(2);
AND (4) MODIFYING AUTOMATIC STAY**

This matter is before the Court on the Emergency Motion (the "*Motion*") of the Debtor **MC**

**PRECAST, INC.,** a Georgia corporation, as debtor and debtor-in-possession in the above-captioned

Chapter 11 case (the *"Debtor"*), requesting entry of an order (1) authorizing Debtor to obtain

financing and other extensions of credit from **ATLANTIC CAPITAL BANK** ("*ACB*" or, in its

capacity as post-petition lender, "*DIP Lender*"), grant security interests and liens and accord

1437324v1

superpriority claim status in favor of DIP Lender pursuant to Sections 361, 364(c) and 364(d) of Title 11 of the United States Code (the "*Bankruptcy Code*"); (2) authorizing Debtor to use cash collateral pursuant to Section 363 of the Bankruptcy Code; (3) giving notice of a final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (4) modifying the automatic stay.

Based upon this Court's review of the Motion and all matters brought to the Court's attention at the interim hearing, which was held on February 12, 2010, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "*Interim Hearing*"), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable to the financing sought by Debtor from DIP Lender and Debtor's request to use cash collateral (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A.    On February 8, 2010 (the "*Petition Date*"), Debtor filed with this Court its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") and is continuing to manage its properties and to operate its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed herein.

B.    Debtor acknowledged in the Motion or at the Interim Hearing that, as of the Petition Date, Debtor was indebted to ACB and One Georgia Bank (collectively, the "*Pre-Petition Lenders*") in at least the approximate principal amounts (excluding interest, fees and other charges) shown below:

| | |
|---|---|
| ACB Line of Credit: | $1,809,564 |
| ACB Real Estate Term Loan: | $4,270,155 |
| One Georgia Bank Real Estate Term Loan: | $1,769,944 |
| One Georgia Bank Line of Credit: | $1,722,964 |

ACB Term Loan:                                                $678,358
ACB Interim Note:                                            $174,993
ACB Contingent Reimbursement
    Obligations (Standby Letter of Credit):     $323,000

The obligations owed by Debtor to Pre-Petition Lenders arise out of loans made by Pre-Petition

Lenders and promissory notes, security deeds, security agreements and related agreements executed

and delivered by Debtor in favor of Pre-Petition Lenders.

C.     ACB asserts that all amounts owed by Debtor to ACB as of the Petition Date (such

principal amounts, together with all interest, fees, attorneys' fees, expenses and other amounts

heretofore or hereafter accruing thereon or at any time chargeable to Debtor in connection therewith,

is referred to as the "*Pre-Petition Debt*") are secured by (i) that certain Security Agreement dated

January 4, 2008, between Borrower and ACB, (ii) that certain Security Agreement dated as of March

5, 2008, between Borrower and ACB, (iii) that certain Security Agreement dated April 30, 2008,

between Borrower and ACB, (iv) that certain Security Agreement dated as of September 19, 2008,

between Borrower and ACB, (v) that certain Commercial Security Agreement dated February 25,

2009, by Borrower in favor of ACB, (vi) that certain Security Agreement dated as of March 20,

2009, between Borrower and ACB, in its capacity as agent for itself and One Georgia Bank, (vii)

that certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20,

2009, made by Borrower in favor of ACB, in its capacity as agent for itself and One Georgia Bank,

and recorded at Deed Book 3440, Page 108-134, Records of Coweta County, Georgia, (viii) that

certain Deed to Secure Debt, Assignment of Rents and Security Agreement dated March 20, 2009,

made by Borrower in favor of ACB, in its capacity as agent for itself and One Georgia Bank, and

recorded at Deed Book 3440, Page 152-178, Records of Coweta County, Georgia, and (ix) that

certain Security Agreement dated as of May 27, 2009, among Borrower, Mahlon C. Rhaney, Jr., and

Kathleen J. Rhaney, in favor of ACB (collectively, the "*Pre-Petition Security Agreements*").

      D.     As security for the payment of all Pre-Petition Debt, Debtor acknowledges that it granted to ACB, for its own benefit and (as to certain Pre-Petition Collateral (defined below)) as agent for the benefit of itself and One Georgia Bank ("*OGB*"),[1] pursuant to the Pre-Petition Security Agreements and related documents (collectively, the "*Pre-Petition Loan Documents*"), security interests in and liens upon all or substantially all of Debtor's real and personal property, which property ACB asserts includes, without limitation, Debtor's facility located in Newnan, Georgia, and all accounts, inventory, equipment, fixtures, general intangibles, chattel paper, contracts, deposit accounts, documents, intellectual property, customer lists, instruments, investment property, letter-of-credit rights, supporting obligations and, to the extent not otherwise included, all proceeds of each of the foregoing and all accessions, to, substitutions and replacements for and rents, profits and products of each of the foregoing (all such real and personal property owned by Debtor, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "*Pre-Petition Collateral*").  ACB asserts, and Debtor is not aware of any basis to contest, that the security interests and liens granted by Debtor to ACB pursuant to the Pre-Petition Loan Documents are legal, valid, enforceable, duly perfected security interests in and liens upon the Pre-Petition Collateral.

      E.     An immediate and ongoing need exists for Debtor to obtain financing and use the cash proceeds of the Collateral (as defined below) (the "*Cash Collateral*") to continue the operation

---

1   References in this Order to "ACB" in connection with pre-petition liens and security interests held by ACB, remittance of proceeds of Pre-Petition Collateral to ACB, and Replacement Liens in favor of ACB shall mean and be construed (1) to refer to ACB alone with respect to Pre-Petition Collateral in which ACB holds a lien or security interests for its sole benefit, and (2) to refer to Atlantic Capital Bank, as agent for the benefit of itself and OGB, with respect to Pre-Petition Collateral in which ACB holds pre-petition liens and security interests in its capacity as agent for the benefit of itself and OGB.

of its business as debtor-in-possession under Chapter 11 of the Bankruptcy Code, to minimize the disruption of Debtor's business and to allow Debtor to pursue an orderly sale of its assets. Despite diligent efforts, Debtor has been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and other than the discretionary financing from DIP Lender pursuant to the DIP Credit Agreement (as hereinafter defined), Debtor is unable to obtain financing in the form of credit secured by liens that are junior to existing liens on property of the estate pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

F.     Debtor has requested that DIP Lender establish a discretionary secured lending facility in favor of Debtor (the "*DIP Facility*") pursuant to which Debtor may obtain loans from time to time  ("*DIP Loans*"), in the sole and absolute discretion of DIP Lender, but not to exceed $500,000 in principal balance outstanding, upon the terms and conditions set forth herein and in a certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits and annexes thereto, and as at any time amended or restated, the "*DIP Credit Agreement*") between DIP Lender and Debtor, in substantially the form attached to the Motion.

G.     DIP Lender is willing to establish the discretionary DIP Facility, upon the terms and conditions set forth herein and in the DIP Credit Agreement. DIP Lender's willingness to make DIP Loans and other extensions of credit (collectively, the "*DIP Credit Extensions*") is conditioned upon, among other things, Debtor's obtaining Court authority to provide adequate protection of ACB's interests in the Pre-Petition Collateral pursuant to Sections 361 and 363 of the Bankruptcy Code.

H.      A condition to the willingness of DIP Lender to establish the DIP Facility is that, as security for the prompt payment of all DIP Loans, together with all interest, fees, expenses and the charges at any time payable by Debtor under the DIP Credit Agreement, DIP Lender receive a security interest in and lien upon all of Debtor's pre-petition and post-petition assets (both real and personal), including, without limitation, Debtor's real property, improvements and fixtures located in Coweta County, Georgia, and all of Debtor's accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, contract rights, investment property, leasehold interests, supporting obligations, cash, and books and records relating to any assets of Debtor and all cash and non-cash proceeds (including insurance proceeds) of the foregoing, whether now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, and the proceeds thereof, being collectively hereinafter referred to as the "*Collateral*"), and that such liens have the priority hereinafter set forth.  The Collateral shall not include Avoidance Claims or Avoidance Proceeds and shall be subject to the Carve-Out, all as defined and set forth below.

I.      Debtor has represented and disclosed that, in addition to liens and security interests in favor of ACB and statutory liens for taxes, Debtor has granted liens and security interests in favor of One Georgia Bank ("*OGB*"); the United States Small Business Administration ("*SBA*"); Consult-US, LLC ("*Consult*"); and Jeffrey S. Muir ("*Muir*").  Pursuant to a Subordination Agreement dated September 19, 2008, between Consult, ACB and Debtor, and a Subordination Agreement dated September 19, 2008, between Muir, ACB and Debtor; each of the Consult and Muir has agreed to subordinate such creditor's liens and security interests in favor of liens and security interests granted by Debtor in favor of ACB.  At the Interim Hearing, counsel for OGB did not oppose the priming

-6-

liens being granted in favor of DIP Lender pursuant to Section 364(d) of the Bankruptcy Code.

OGB, Consult and Muir are hereinafter referred to as the "*Subordinated Creditors*."

J.        Debtor requested in the Motion, pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2),

that the Court hold the Interim Hearing to consider authorizing Debtor to (i) obtain, on an interim

basis, DIP Loans for purposes specified in Debtor's cash flow forecast annexed to the Motion (as at

any time amended with the consent of DIP Lender, the "*Budget*"); and (ii) to use Cash Collateral as

hereinafter set forth.

K.        Debtor has certified that a copy of the Motion (together with copies of the proposed

DIP Credit Agreement and Budget annexed thereto) and notice of the Interim Hearing have been

served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class

United States mail upon the United States Trustee (the "*U.S. Trustee*"), counsel for ACB, each of the

Subordinated Creditors, the 20 largest creditors of Debtor, the Internal Revenue Service, and any

known lien creditors of Debtor.  The Court finds that notice of the Motion, as it relates to this Order,

is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including,

without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b)

and (c).

L.        Good cause has been shown for the entry of this Order and authorization for Debtor

to obtain DIP Credit Extensions pursuant to the DIP Credit Agreement and to use Cash Collateral as

hereinafter provided pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(b)(2)

and (c)(2) (the "*Final Hearing*").  Debtor's need for financing of the type afforded by the DIP Credit

Agreement is immediate and critical.  Entry of this Order will minimize disruption of Debtor's

business and operations, will preserve the assets of Debtor's estate and is in the best interests of

Debtor, its creditors and its estate.  The terms of the proposed financing and use of Cash Collateral appear fair and reasonable, reflect Debtor's exercise of business judgment and are supported by reasonably equivalent value and fair consideration.

M.    Based upon the record presented at the Interim Hearing, it appears that the DIP Credit Agreement and this Interim Order have been negotiated in good faith and at arm's length between Debtor, on the one hand, and ACB and DIP Lender, on the other.  Therefore, all DIP Credit Extensions to Debtor pursuant to the DIP Credit Agreement shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

N.    This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1.    Grant of Motion; Authorization of Interim Financing.  The Motion is hereby granted and Debtor is hereby authorized (i) to execute and deliver the DIP Credit Agreement in substantially the form annexed to the Motion and all instruments, security agreements, assignments, pledges, mortgages and other documents referred to therein or requested by DIP Lender to give effect to the terms thereof (the DIP Credit Agreement and such other instruments, security agreements, assignments and other documents, as at any time amended, being collectively called the "*DIP Financing Documents*"); (ii) to obtain DIP Loans and other DIP Credit Extensions in accordance with the DIP Credit Agreement from time to time up to an aggregate principal amount outstanding at any time not to exceed $500,000, and to incur any and all liabilities and obligations thereunder and

to pay all interest, fees, expenses and other obligations provided for under the DIP Financing Documents; and (iii) to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof; provided, however, that, pending the Final Hearing and subject to all of the terms and conditions in the DIP Credit Agreement, Debtor may obtain DIP Credit Extensions only to the extent necessary to avoid immediate and irreparable harm to Debtor, which, for purposes hereof, shall mean proceeds of DIP Loans used (a) to pay the fees and expenses due and amounts owing by Debtor at any time to DIP Lender under the DIP Financing Documents, (b) for purposes specified (and in amounts not to exceed those shown) in the Budget, (c) to make payments pursuant to "first day" orders reviewed and approved by the Court and the DIP Lender, and (d) to pay other expenses that are authorized to be paid, prior to the Final Hearing, under the DIP Credit Agreement. DIP Lender shall not have any obligation or responsibility to make any DIP Credit Extensions (consistent with the discretionary nature of the DIP Facility) or to monitor Debtor's use of the DIP Loans or Cash Collateral and may rely upon Debtor's representations that the amount of DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Credit Agreement and Bankruptcy Rule 4001(c)(2).  Neither the use of Cash Collateral by the Debtor nor the DIP Loans authorized under this Order shall impair, release or alter any liability of any guarantor, pledgor, co-obligor or surety with respect to the Pre-Petition Debt.

2.      Execution and Delivery of DIP Financing Documents.  Upon execution and delivery thereof, the DIP Financing Documents shall constitute valid and binding obligations of Debtor, enforceable against Debtor in accordance with their terms.  In furtherance of the provisions of paragraph 1 of this Order, Debtor is authorized and directed to do and perform all acts, to make,

execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings), and to pay all filing and recording fees, in each case as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Financing Documents, to validate the perfection of the DIP Liens (as defined below) or as otherwise required or contemplated by the DIP Financing Documents.

3.    <u>DIP Liens</u>.  Subject to the provisions of subparagraph 8(b) below, all DIP Credit Extensions, together with all interest, fees and other charges (including, without limitation, reasonable legal fees) at any time or times payable by Debtor to DIP Lender in connection therewith or otherwise pursuant to the DIP Financing Documents (all such DIP Credit Extensions, interest fees and other charges, including any "Obligations" as such term is defined in the DIP Credit Agreement, are collectively called the "*DIP Obligations*") shall be, and hereby are, secured by security interests and liens in favor of  DIP Lender with respect to all of the Collateral (collectively, the "*DIP Liens*"), as follows:

(a)    pursuant to Section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon all Collateral that, as of the Petition Date, is not subject to other valid, perfected and non-avoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code; and

(b)    pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and non-

-10-

avoidable liens in existence on the Petition Date (other than liens in favor of ACB or any

Subordinated Creditor) or to valid and unavoidable liens in existence on the Petition Date

that are perfected thereafter (with a priority that relates back to a date prior to the Petition

Date) as permitted by Section 546(b) of the Bankruptcy Code; and

      (c)      pursuant to Section 364(d) and Section 510(a) of the Bankruptcy Code, the

DIP Liens shall prime and shall be in senior in priority to all Pre-Petition Liens and security

interests with respect to any of the Collateral that exist in favor of ACB (whether for the

benefit of itself or for the benefit of itself and OGB) or any Subordinated Creditor.  For the

avoidance of doubt, nothing in this Order shall alter or affect the priority of the liens and

security interests of the SBA in respect of any of the Pre-Petition Collateral.

Notwithstanding the foregoing provisions of this paragraph 3 or anything to the contrary in the DIP

Financing Documents, the DIP Liens shall be subject to the Carve-Out (defined below), as and to the

extent provided below, and the DIP Liens shall not attach to any of the following property (unless

Debtor shall grant or consent to any lien or security interest therein in favor of any other party, in

which event all such property shall be subject to the DIP Liens referred to in subparagraph (a) of this

paragraph 3): (x) any claims pursuant to Sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy

Code ("*Avoidance Claims*"), or (y) any proceeds or property recovered in connection with the

successful prosecution or settlement of Avoidance Claims ("*Avoidance Proceeds*").

4.      <u>Superpriority Claim; Surcharge</u>.

(a)      Subject to the provisions of paragraph 8(b) below, all DIP Obligations shall have administrative priority in accordance with, and shall constitute an allowed superpriority claim (the "*Superpriority Claim*") pursuant to, Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in Debtor's case of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Superpriority Claim shall not attach to any Avoidance Claims, be payable from any Avoidance Proceeds or adversely affect the Carve-Out (as defined below).

(b)      Except for the Carve-Out, no costs or administrative expenses that have been or may be incurred in the Chapter 11 Case, in any proceedings related hereto or in any superseding Chapter 7 case and no priority claims are or will be prior to or on a parity with the Superpriority Claim of DIP Lender for the DIP Obligations.  Subject to entry of a final order on the Motion, in no event shall any costs or expenses of administration be imposed upon ACB, DIP Lender or any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of ACB and DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by either of them.

5.      <u>Repayment</u>.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Financing Documents and as provided herein, without offset or counterclaim.  In no event shall Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by DIP Lender to Debtor or any of its subsidiaries or affiliates against any of the DIP Obligations unless and to the extent expressly otherwise agreed to in writing by DIP Lender.

-12-

DIP Lender and any of its successors or assigns shall be entitled to credit bid all or any portion of the outstanding DIP Obligations for all or any part or portion of the Collateral.

6.     Use of Cash Collateral.

(a)     Debtor shall, promptly after its receipt thereof, remit to ACB (in its capacities as pre-petition secured party and DIP Lender) all Cash Collateral at any time in the possession of Debtor; provided, however, that for so long as (i) no Event of Default has occurred under (and as defined in) the DIP Credit Agreement, (ii) all of the conditions precedent to DIP Credit Extensions contained in the DIP Credit Agreement are satisfied, and (iii) the Termination Date has not occurred under (and as defined in) the DIP Credit Agreement, Debtor shall be authorized to retain, and to utilize in the ordinary course of its business and for the purposes and in the amounts provided in the Budget, Cash Collateral in the amounts shown in the Budget. Nothing herein shall be deemed to constitute a consent by DIP Lender or ACB to any sale or other disposition of any Collateral or an agreement of either of them to release its security interests in any of the Collateral. Unless and until all of the Pre-Petition Debt and DIP Obligations have been paid in full and the DIP Facility has terminated, Debtor shall not be authorized to use any Cash Collateral (i) for any purpose except as otherwise authorized by this Order or (ii) obtained as a result of, or at any time after, the closing of a sale authorized by the Court under Section 363 of the Bankruptcy Code.  Notwithstanding the foregoing, all Collateral (including Cash Collateral) shall be subject to the Carve-Out.

(b)     Except as otherwise expressly provided in paragraph 6(a), all proceeds realized from any sale or other disposition of any Collateral shall be remitted directly to ACB for application to the Pre-Petition Debt and DIP Obligations.  Without limiting the generality of the foregoing, ACB is hereby authorized to negotiate and apply to the Pre-Petition Debt the funds represented by a check

-13-

from Westfield Insurance dated January 26, 2010, in the amount of $20,616.21, which was endorsed by Debtor prior to the Petition Date.

7.      <u>Adequate Protection of Pre-Petition Lenders</u>.  As adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for the Debtor's use, consumption, sale, collection or other disposition of any of the Collateral:

(a)      ACB is hereby granted replacement liens in and to all of the Collateral that is created, acquired or first arises after the Petition Date (the "*Replacement Liens*") as partial adequate protection to the extent of the diminution in value of the Collateral caused by the Debtor's use, consumption, sale, collection or other disposition of any Collateral. The Replacement Liens in favor of ACB on the Collateral shall be junior in priority to the DIP Liens granted to the DIP Lender and shall be held by ACB for the benefit of itself and, as to diminution in the value of certain Pre-Petition Collateral as to which ACB holds pre-petition liens and security interests as agent, for the ratable benefit of OGB.

(b)      Nothing herein shall be deemed to be a waiver by ACB of its rights to request additional or further protection of its interests in any property of Debtor, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the conversion or dismissal of the Chapter 11 Case, or to request any other relief in this case, nor shall anything herein or in any of the DIP Financing Documents constitute an admission by ACB or DIP Lender of the quantity, quality or value of any Collateral or constitute a finding of adequate protection with respect to the interests of ACB in any Collateral.  ACB shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, or other disposition of any of the Collateral, to the extent that the protection afforded by this Order

-14-

to ACB's pre-petition interests in any Collateral proves to be inadequate.

      8.    <u>Carve-Out</u>.

      (a)    As used herein, "*Professional Expenses*" shall mean, collectively, compensation and expense reimbursement of professionals (including attorneys, accountants, appraisers, consultants and investment bankers) retained by Debtor (the "*Professional Persons*"), in each case only to the extent that such compensation and expense reimbursement is approved by the Court.

      (b)    The DIP Liens and Superpriority Claim conferred upon DIP Lender shall be subject and subordinate to the payment of (i) Professional Expenses of Professional Persons that are approved for payment by final order of the Court  and do not exceed $40,000 in the aggregate (to the extent that retainers paid to such Professional Persons are insufficient and there are not sufficient, unencumbered funds in Debtor's estate); (ii) fees required to be paid to the Clerk of the Court; and (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in the preceding clauses (i), (ii) and (iii) are collectively called the "*Carve-Out*"); <u>provided</u>, <u>however</u>, that no proceeds of DIP Loans or any of the Collateral and no amounts received pursuant to the Carve-Out shall be used to pay Professional Expenses of any Professional Person or any other costs incurred in connection with (1) commencing or continuing any claims, causes of actions or contested matters against DIP Lender or ACB, including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (2) preventing, hindering or delaying performance or enforcement by DIP Lender or ACB of its rights or remedies under this Order, any of the DIP Financing Documents or any of the Pre-Petition Loan Documents; (3) challenging any liens or security interests in favor of ACB or the DIP Liens or Superpriority Claim

-15-

of DIP Lender; or (4) any other purpose prohibited by the DIP Financing Documents; provided,
however, that the foregoing limitations shall not apply to Professional Expenses incurred in
reviewing the Pre-Petition Loan Documents and the calculation of the Pre-Petition Debt and
evaluating the perfection and priority of ACB's liens upon and security interests in the Pre-Petition
Collateral.

(c)     DIP Lender may, in its sole discretion at any time, make one or more DIP
Loans pursuant to the DIP Credit Agreement to fund the Carve-Out.  All such DIP Loans shall be
entitled to all of the benefits and security of the DIP Financing Documents and this Order and shall
reduce the Carve-Out to the extent of any such DIP Loans used to fund the Carve-Out.  After the
Carve-Out has been fully funded, the Carve-Out provided in paragraph 8(b) of this Order shall be
satisfied and the DIP Liens and Superpriority Claims conferred upon DIP Lender shall no longer be
subject and subordinate to payment of the Carve-Out.  The proceeds of any such DIP Loan shall be
held by Debtor's counsel for the benefit of the payment of Professional Persons.  No person shall
have any claim to the proceeds of any DIP Loan used to fund the Carve-Out other than (i) the
Professional Persons and (ii) DIP Lender's right to refund of any excess after payment of all fees and
expenses that are included in the Carve-Out as defined in paragraph 8(b).

9.     Preservation of Rights Granted Under This Order.

(a)     There shall not be entered in the Chapter 11 Case or in any successor case any
order that authorizes the obtaining of credit or the incurrence of indebtedness by Debtor (or any
trustee or examiner) that is (i) secured by a security, mortgage or collateral interest or lien on all or
any part of the Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority
administrative status that is equal or senior to the Superpriority Claim granted to DIP Lender herein;

-16-

provided, however, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations must be indefeasibly paid in full, in cash, from the proceeds of such credit or indebtedness.

(b)     If the Chapter 11 Case is dismissed or converted, then neither the dismissal nor the conversion of the Chapter 11 Case shall affect the rights of DIP Lender under the DIP Financing Documents or this Order, and all of the respective rights and remedies thereunder of DIP Lender shall remain in full force and effect as if the Chapter 11 Case had not been dismissed or converted. It shall constitute an Event of Default if Debtor seeks, or if there is entered, any Order dismissing the Chapter 11 Case. If an order dismissing the Chapter 11 Case is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens, Replacement Liens and Superpriority Claim granted to and conferred upon ACB and DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such liens and Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Replacement Liens and Superpriority Claim referred to herein.

(c)     The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or converting the Chapter 11 Case from Chapter 11 to Chapter 7.

(d)      The DIP Obligations shall not be discharged by the entry of any order confirming a plan of reorganization in the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, Debtor has waived such discharge.

(e)      In no event shall DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any Collateral securing any of the DIP Obligations; and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

10.      <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens shall be deemed valid, binding, enforceable and perfected upon entry of this Order.  DIP Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the DIP Liens.  If DIP Lender shall, in its discretion, choose to file any such mortgages, deeds of trust, intellectual property filings, security deeds or UCC-1 financing statements, or take any other action to validate the perfection of any part of the DIP Liens, then Debtor and its officers are directed to execute any documents or instruments as DIP Lender shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.  DIP Lender may, in its discretion, file a certified copy of this Order in any filing office in any jurisdiction in which Debtor is organized or has or maintains any Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording.

-18-

11.    <u>Reimbursement of Expenses</u>.  All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of the DIP Financing Documents, or any amendments thereto, the preservation, perfection, protection and enforcement of DIP Lender's rights hereunder or under the DIP Financing Documents, or in the collection of the DIP Obligations, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations and shall be paid by Debtor (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Financing Documents.

12.    <u>Amendments to DIP Financing Documents</u>.  Debtor and DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents, any amendments to and modifications of any of the DIP Financing Documents without further order of the Court on the following conditions:  (i) the amendment or modification must not constitute a material change to the terms of the DIP Financing Documents, (ii) copies of the amendment or modification must be served upon Debtor's 20 largest creditors, the U.S. Trustee, and other interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with the Court.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court (and, for purposes hereof, a "material change" shall mean a change that operates to shorten the maturity of the DIP Obligations, increase the aggregate principal amount available under the DIP Facility, increase the rate of interest other than as currently provided in or contemplated by the DIP Financing Documents, add specific events of default, enlarge the nature

-19-

and extent of default remedies available to DIP Lender following an event of default, or is a change
that is both material and adverse to Debtor).

        13.    <u>Events of Default; Remedies</u>.

        (a)    Upon or after the occurrence of an "Event of Default" under (and as defined
in) the DIP Credit Agreement, including, without limitation, an Event of Default resulting from the
failure of Debtor to pay any of the DIP Credit Extensions when due; breaches of financial,
affirmative, and negative covenants in the DIP Loan Documents; the falsity or material inaccuracy
of any representations or warranties in the DIP Loan Documents; the appointment of a trustee or
examiner with expanded powers, or dismissal or conversion to Chapter 7 of the Chapter 11 Case;
confirmation of any plan of reorganization in the Chapter 11 Case, other than one providing for
payment in full, on the effective date, of all of the DIP Credit Extensions owing to DIP Lender and
otherwise acceptable to ACB; amendment or stay of this Order or any subsequent order on the
Motion or reversal, modification, or vacation of any of such orders, whether on appeal or otherwise;
the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash
proceeds of any of the Collateral without DIP Lender's consent or Debtor's obtaining any financing
under Section 364(d) of the Bankruptcy Code with respect to any of the Collateral; the failure of
Debtor to file a motion seeking approval to sell all or substantially all of its assets under Section 363
of the Bankruptcy Code on or prior to February 19, 2010; the challenge by Debtor or any committee
of the validity, extent, perfection, or priority of any liens of DIP Lender or ACB; any person or
entity holding a lien upon any pre-petition or post-petition asset of Debtor being granted relief from
the automatic stay if the value of the property that is the subject of such lien is equal to or greater
than $10,000; or a final financing order acceptable to DIP Lender is not entered on or before March

-20-

10, 2010; then, in any such event, DIP Lender shall be fully authorized, in its sole discretion, to terminate further DIP Credit Extensions under the DIP Facility as provided in the DIP Credit Agreement, to demand payment of all DIP Obligations, and, upon ten (10) business days' prior written notice to counsel for Debtor and the U.S. Trustee, to enforce the DIP Liens with respect to the Collateral and to take all other action and exercise all other remedies under the DIP Financing Documents and applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations, to proceed against or realize upon all or any portion of the Collateral as if the Chapter 11 Case or any superseding Chapter 7 case was not pending and otherwise to enforce the DIP Financing Documents and this Order.

(b)     The rights, remedies, powers and privileges conferred upon DIP Lender and ACB pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Financing Documents and the Pre-Petition Loan Documents.

14.     <u>Monitoring of Collateral</u>.

(a)     Representatives of DIP Lender shall be authorized to visit the business premises of Debtor to inspect any Collateral and to verify or to obtain supporting details concerning the financial information to be provided to DIP Lender hereunder or under any of the DIP Financing Documents, all as permitted by the DIP Credit Agreement.

(b)     DIP Lender shall be authorized to retain appraisers, consultants and financial advisors, at Debtor's expense, which appraisers, consultants and advisors shall be afforded reasonable access to the Collateral and Debtor's business premises, during normal business hours, for purposes of monitoring the business of Debtor, verifying Debtor's compliance with the terms of

the DIP Financing Documents and this Order, and (to the extent authorized by the DIP Financing Documents) appraising all or any part of the Collateral.

15.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this Order and the DIP Financing Documents, thereby permitting DIP Lender and ACB, *inter alia*, to receive collections of Collateral for application to the Pre-Petition Debt and the DIP Obligations as provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon default subject to the prior notice provisions of this Order.

16.    <u>Effect of Appeal</u>.  Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

(a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Lien granted or incurred by Debtor to DIP Lender prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Lien, priority or right authorized or created under the original provisions of this Order or pursuant to the DIP Financing Documents; and

(b)    any indebtedness, obligation or liability incurred by Debtor to DIP Lender under the DIP Financing Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to all the rights, remedies, privileges and benefits, including the DIP Liens and priorities granted herein and pursuant to the DIP Financing Documents, with respect to any such indebtedness,

obligation or liability.  All DIP Credit Extensions under the DIP Financing Documents are made in reliance upon this Order, and, therefore, the indebtedness resulting from such DIP Credit Extensions prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens or superpriority  administrative claim status, or (iii) be deprived of the benefit of the status of the DIP Liens and Superpriority Claim granted to DIP Lender under this Order or the DIP Financing Documents, as a result of any subsequent order in the Chapter 11 Case, or any superseding case, of Debtor.

17.    <u>Deadline for Challenge to Pre-Petition Liens and Claims</u>.  In consideration of DIP Lender's agreement to provide DIP Credit Extensions pursuant to the DIP Financing Documents, but subject to entry of a final order on the Motion, Debtor has waived and shall be barred (a) from challenging the amount, validity, extent, perfection or priority of or seeking to set aside, avoid, offset, recharacterize or subordinate any of the Pre-Petition Debt or any liens or security interests of ACB in the Collateral and (b) from asserting against ACB or DIP Lender a claim under any lender liability theories or pursuant to Sections 105, 510, 544, 547, 548, 549 or 550 of the Bankruptcy Code.  In addition to the foregoing, the validity, extent, enforceability and perfection of the liens and security interests of ACB in the Collateral shall be subject only to the rights of any interested party (other than Debtor, subject to entry of a final order on the Motion) having standing to do so to commence an appropriate adversary proceeding or contested matter objecting to the validity or amount of the Pre-Petition Debt or the extent, validity, perfection or non-avoidability of the pre-petition liens and security interests of ACB in the Collateral, which adversary proceeding or contested matter must be filed no later than the earlier to occur of (i) the date of any hearing with respect to approval of a sale of Debtor's assets under 11 U.S.C. § 363 or (ii) 60 days after the date of

-23-

entry of this Order.  If such adversary proceeding or contested matter is not timely filed, the liens

and security interests of ACB in the Collateral shall be deemed legal, valid, binding, enforceable,

perfected and unavoidable and all of the Pre-Petition Debt shall be an allowed claim against the

Debtor and conclusive and binding upon all parties in interest in these cases and in any superseding

Chapter 7 case, including any subsequently appointed trustee, as a legal, valid, binding, enforceable

claim that is not subject to offset, counterclaim, equitable subordination, recharacterization or other

defense or claim.

18.      Service of Order.  Promptly after the entry of this Order, Debtor shall mail, by first

class mail, a copy of this Order, the Motion (and all exhibits attached to the Motion), and a notice of

the Final Hearing, to counsel for Pre-Petition Lender and DIP Lender, the Subordinated Creditors,

the U.S. Trustee, the 20 largest unsecured creditors of Debtor, the Internal Revenue Service, and all

known lienholders at their respective last known addresses, and all parties who have filed requests

for notices under Rule 2002 of the Bankruptcy Rules, and shall file a certificate of service regarding

same with the Clerk of the Court.  Such service shall constitute good and sufficient notice of the

Final Hearing.

19.      No Deemed Control.  By consenting to this Order, making DIP Credit Extensions or

administering the financing relationship with Debtor pursuant to the DIP Financing Documents, DIP

Lender shall not be deemed to be in control of Debtor or its operations or to be acting as a

"responsible person," "managing agent" or "owner or operator" (as such terms are defined in the

United States Comprehensive Environmental Response, Compensation and Liability Act, as

amended, or any similar state or federal statute) with respect to the operation or management of

Debtor.

-24-

20.   <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, DIP Lender and Debtor and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed or elected for the estate of Debtor or any Chapter 7 trustee appointed in a superseding Chapter 7 case), and shall inure to the benefit of DIP Lender, ACB, Debtor and their respective successors and assigns.  In no event shall DIP Lender have any obligation to make DIP Credit Extensions to any Chapter 7 or Chapter 11 trustee appointed or elected for the estate of Debtor.

21.   <u>Final Hearing</u>.  The Final Hearing shall be held at **10:00 o'clock a.m., on March 2, 2010**, at the U.S. Bankruptcy Court, Second Floor Courtroom, Lewis R. Morgan Federal Building, 18 Greenville Street, Newnan, Georgia. If any or all of the provisions of this Order are modified, vacated or stayed as the result of any objection timely filed and asserted at the Final Hearing, then, without limiting the provisions of paragraph 16 hereof, any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Liens and superiority claim status granted herein and pursuant to the DIP Financing Documents with respect to all such DIP Obligations.

22.   <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Order, such party shall be authorized to assert such objection at the Final Hearing, provided that a written statement setting forth the basis for such objection is filed with the Court, and concurrently served upon the Office of the United States Trustee at Room 362, U.S. Courthouse, 75 Spring Street SW, Atlanta, Georgia 30303; counsel for Debtor, Scroggins & Williamson, 127

Peachtree Street NE, 1500 Candler Building, Atlanta, Georgia 30303, Attn: John T. Sanders IV,

Esq.; and counsel for DIP Lender and ACB, Parker Hudson Rainer & Dobbs LLP, 1500 Marquis

Two Tower, 285 Peachtree Center Avenue, Atlanta, Georgia 30303, Attention: James S. Rankin,

Jr., Esq., in each case so that such objections and responses are filed on or before 5:00 p.m.,

prevailing Eastern time on **February 26**, **2010**. Unless an objecting party shall be and appear at the

Final Hearing to assert the basis for such objection before the Court, such objection shall be deemed

to have been waived and abandoned by such objecting party.

      23.   <u>Inconsistencies</u>.  To the extent that any provisions in the DIP Credit Agreement are

inconsistent with any of the provisions of this Order, the provisions of this Order shall govern and

control.

**[END OF DOCUMENT]**

Prepared and presented by:

 /s/ John T. Sanders, IV
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
JOHN T. SANDERS, IV
Georgia Bar No. 625705
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
Scroggins & Williamson
1500 Candler Building
127 Peachtree Street, N.E.
Atlanta, GA  30303
Counsel for Debtor

## <u>DISTRIBUTION LIST</u>

J. Robert Williamson, Esq.
Scroggins & Williamson
1500 Candler Building
127 Peachtree Street, NE
Atlanta, GA 30303

Office of the United States Trustee
362 Richard Russell Building
75 Spring Street, S.W.
Atlanta, GA  30303